**UNITED STATES INFORMATION AGENCY, Appellee,**

v.

**Jan KRC, Appellant.**

No. 89–5220.

United States Court of Appeals, District of Columbia Circuit.

Argued May 4, 1990.

Decided June 5, 1990.

R. Laird Hart, with whom John P. Rupp, Arthur B. Spitzer and Elizabeth Symonds, Washington, D.C., were on the brief for appellant.

Edward R. Cohen, Atty., U.S. Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Barbara L. Herwig, Atty., U.S. Dept. of Justice, Washington, D.C., were on the brief for appellee.

Susan Z. Holik, was on the brief for amicus curiae.

Before WALD, Chief Judge, and MIKVA and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

Separate Statements filed by WALD, Chief Judge, and MIKVA, Circuit Judge.

WALD, Chief Judge:

In early 1985, the United States Information Agency ("USIA" or "the agency") terminated appellant Jan Krc's employment in the Foreign Service.[1] After the Foreign Service Grievance Board ("FSGB" or "the Board") ordered Krc's reinstatement without prejudice, USIA appealed to the United States District Court for the District of Columbia, which refused to enforce the Board's decision. The district court also dismissed Krc's claims that his termination violated his constitutionally protected liberty and property interests, as well as his statutory rights under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.* (1988). We remand for the district court to consider Krc's assertion of a violation of his right to equal protection, but otherwise affirm the trial judge's conclusions.

### I. BACKGROUND

#### A. *Statutory*

The 1980 Foreign Service Act ("the Act") created the FSGB to resolve certain types

---

**1.** USIA is authorized to employ members of the Foreign Service. 22 U.S.C. § 3922(a)(1) (1988).

of "grievances" brought by members of the Foreign Service. *See generally* 22 U.S.C. §§ 4131 *et seq.* (1988). The Board is composed of

> no fewer than 5 members who shall be independent, distinguished citizens of the United States, well known for their integrity, who are not employees of the Department [of State] or members of the [Foreign] Service.

*Id.* § 4135(a). In general, a "grievance" is

> any act, omission, or condition subject to the control of the Secretary [of State] which is alleged to deprive a member of the Service who is a citizen of the United States of a right or benefit authorized by law or regulation or which is otherwise a source of concern or dissatisfaction to the member....

*Id.* § 4131(a)(1). The Act lists several examples of grievances, including "separation of the member allegedly contrary to laws or regulations." *Id.* § 4131(a)(1)(A). Expressly excluded from the grievances under the FSGB's jurisdiction, however, is "the termination of a limited appointment under [section 611 of the Act]...." *Id.* § 4131(b)(3). Section 611 provides that the Secretary of State "may terminate at any time" the appointment of most members of the Service serving under a limited appointment, *id.* § 4011, *unless* "separation is to be by reason of misconduct," *id.* § 4010(a)(2)(B). If a limited appointment member is separated for misconduct—a separation pursuant to § 610 of the Act, *id.* § 4010(a)(2)(B)—the member is entitled to a "hearing before the Foreign Service Grievance Board and the cause for separation established at such hearing...." *Id.*

Upon finding a grievance properly within its jurisdiction to be meritorious, the Board is authorized to direct the State Department to correct the grievant's official personnel record; to reverse a decision denying the grievant compensation or any other perquisite of employment; to reinstate the grievant; and to take other appropriate remedial action. *Id.* § 4137(b). Furthermore, if the FSGB finds that a grievance merits remedial action "that relates directly to promotion, tenure, or assignment of

the grievant," the FSGB "shall make an appropriate recommendation" to the Secretary of State. The Secretary shall implement that recommendation unless, within a thirty-day period, the Secretary rejects the Board's recommendation on the grounds that implementation "would be contrary to law or would adversely affect the foreign policy or national security of the United States." *Id.* § 4137(d). "[A]ggrieved" parties may obtain review by a United States district court of final actions taken by the Secretary of State or the Board with regard to "any grievance," according to the standards set by the APA. *Id.* § 4140.

### B. *Procedural*

Jan Krc, born in Czechoslovakia in 1956 and naturalized in 1973, entered the Foreign Service under a "limited" appointment as an "officer candidate" in 1982, and was first posted abroad, to Yugoslavia, in 1983. Before and during his Yugoslav posting, Krc attended Foreign Service security briefings informing him that the fraternization policy for Foreign Service members posted in Yugoslavia was more liberal than the policy with regard to other East Bloc countries, and that casual sex was permissible. Krc claims that he also determined that local norms and laws did not impede casual relationships, homosexual or heterosexual. During his posting, he had homosexual relationships with two other Foreign Service officers, two individuals who may have been Yugoslav citizens, and a third country national. The information Krc received during the briefings, however, did not comport with the fraternization policy of USIA's home office, which prohibited all sexual contact with Yugoslav citizens.

During his debriefing at the end of his posting in 1984, Krc told a USIA security officer that he had engaged in homosexual conduct while in Yugoslavia. On the basis of that debriefing, USIA cancelled Krc's pending posting to South Africa to investigate his admissions. On October 3, 1984, Krc was notified by USIA's Office of Personnel that he was being terminated for insubordination and misconduct pursuant to §§ 610 and 611 of the Act. After Krc provided documentation that he had never

been informed of USIA's strict fraternization policy, Angie Garcia, USIA's Personnel Director, issued a letter of reprimand in lieu of termination. A month later, on January 11, 1985, Bernard Dowling, USIA's Director of Security, informed Garcia that he would "not approve any foreign service assignment of Mr. Krc because of the strong security risk involved." Joint Appendix ("J.A.") 106. Dowling explained that Krc's homosexuality would make him extremely vulnerable to hostile intelligence approaches. Garcia informed Krc two weeks later that in light of Dowling's promise not to approve future overseas assignments, she was terminating his Foreign Service appointment effective February 28, 1985, pursuant to § 611 of the Act.

On March 2, 1985, USIA officially terminated Krc's Foreign Service appointment. The next day, however, USIA appointed him to a position in its domestic civil service, at an annual salary $333 higher than his Foreign Service salary. USIA never revoked Krc's security clearance, which he continues to use for his domestic work.

Krc filed a complaint with the FSGB protesting the termination of his Foreign Service appointment. The FSGB initially decided in August 1985 that Krc's complaint constituted a grievance within its jurisdiction; in March 1987, the FSGB ordered Krc reinstated to the Foreign Service on the grounds that his termination was "arbitrary and capricious and contrary to agency regulations." J.A. 58. The Board found no nexus between "the interests of national security" and the factors on which USIA had relied in denying Krc's clearance for overseas duty, J.A. 62, and therefore ordered USIA to remove the restriction barring Krc from overseas assignments and to reinstate Krc, without prejudice, to a new five-year term as a Foreign Service career candidate.

In June 1987, USIA sued in United States District Court for the District of Columbia to set aside the FSGB's action. Krc counterclaimed, seeking enforcement of the Board's order and alleging that USIA's failure to obey the order violated both his statutory rights under the APA as well as his constitutional due process rights. See J.A. 232–37. In its first opinion, on April 20, 1989, the district court granted USIA's motion to set aside the Board's order on the ground that the FSGB "did not have the authority to review USIA's revocation of [Krc's] security approval for overseas service and to order his reinstatement as a limited appointee...." *United States v. Krc*, No. 87–1740, slip op. at 13 (D.D.C. Apr. 20, 1989).[2] This holding was based largely on *Department of the Navy v. Egan*, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988), which had been handed down after the FSGB's determination. The district judge also dismissed Krc's claim to a violation of his property interest without due process. In a second opinion, filed May 31, 1989, the judge dismissed Krc's claims that USIA violated his liberty interest; without any discussion, he also rejected Krc's contention that USIA violated his statutory rights under the APA, and dismissed the case from the court's docket. *United States Information Agency v. Krc*, No. 87–1740, slip op. at 5 (D.D.C. May 31, 1989) (order) [hereinafter cited as May 31 Order]. As Part II–C, *infra*, discusses further, the judge apparently ignored Krc's May 1 amended counterclaim, *see* J.A. 238–49, which detailed his equal protection claims. On July 21, the judge dismissed for lack of jurisdiction Krc's June 2 motion to file a second amended counterclaim further delineating his constitutional claims. *United States Information Agency v. Krc*, No. 87–1740 (D.D.C. July 21, 1989) (order dismissing motion to amend counterclaim for lack of jurisdiction).

## II. ANALYSIS

We now consider the district court's refusal to enforce the Board's decision and the court's dismissal of Krc's statutory and constitutional claims.

---

**2.** The case should have been styled *United States Information Agency v. Krc*, since the trial judge had long since granted Krc's motion to strike the United States as a named party. *See* J.A. 5 (Docket Item 25).

## A. *Enforcement of the Board's Order*

■ The enforceability of the Board's decision depends on the Board's jurisdiction to review USIA's termination of Krc from the Foreign Service. The Board's jurisdiction, in turn, depends on the alleged reasons for Krc's termination under the Foreign Service Act.

### 1. Reasons for Krc's Termination

In her January 1985 letter, USIA's Director of Personnel informed Krc that the agency was terminating him "by authority of Section 611," which authorizes the Secretary of State to terminate the appointment of a limited Foreign Service appointee "at any time"; the termination, she explained, was "not a disciplinary or performance-based action." J.A. 107. The record presents little reason to question this assertion. Although Bernard Dowling, USIA's Director of Security, felt that Krc's "conduct [in Yugoslavia] ... showed poor judgment and lack of discretion," Dowling decided not to approve future overseas postings for Krc because of his belief that Krc's "homosexuality would make him an extremely likely security target for hostile intelligence approaches." J.A. 106. Dowling subsequently explained that he did "not want to be responsible as the director of security for placing [Krc] in an environment where he could be subjected to a hostile intelligence approach." J.A. 524.

Krc was terminated from the Foreign Service because Dowling believed that his homosexuality made him "an intolerable security risk," J.A. 106, not because Krc had violated a canon of conduct governing Foreign Service officers. Indeed, Garcia had withdrawn her initial October 1984 termination decision after Krc provided evidence that he had never been informed of USIA's "stricter" fraternization policy and had made substantial efforts to comply with the policy communicated to him. The FSGB viewed Krc's termination similarly, concluding that USIA's decision to dismiss "was based solely on the determination of the Office of Security not to clear Krc for

an overseas assignment." J.A. 57. Thus, even if Dowling's security concerns were unjustified, Krc's termination was not conduct-based and was legitimately classified under § 611.[3]

### 2. Section 611 Procedures

A Foreign Service member terminated pursuant to § 611 has few avenues of appeal. The Act expressly states that "the termination of a limited appointment under [§ 611]" is not grievable before the FSGB. 22 U.S.C. § 4131(b)(3). On the other hand, "any act, omission, or condition subject to the control of the Secretary" that is a "source of concern or dissatisfaction to the member," including "separation of the member allegedly contrary to laws or regulations," is grievable. *Id.* § 4131(a)(1). In juxtaposition, these two provisions permit a Foreign Service member to grieve the question of whether USIA's *classification* was legitimate, as USIA would act "contrary to law[ ]" if it professed to terminate a limited appointee under § 611 when the termination was actually due to the appointee's misconduct. We need not define today the precise parameters of the hearing due an employee who the Board finds was actually terminated for misconduct. But the statute makes clear that a limited appointee who the Board finds was not terminated for misconduct—whose termination was properly classified under § 611—has no further remedy with the FSGB; such a termination is statutorily excluded from the "grievances" within the Board's jurisdiction.

The record here demonstrates clearly that Krc was not terminated for misconduct. The Board agreed with USIA's explicit explanation that Krc was not terminated for conduct-related reasons. The Foreign Service Act, therefore, excludes the agency's determination from the Board's purview. In Parts II–B and II–C, *infra*, we consider whether, and in what degree, Krc's claims are judicially reviewable.

---

**3.** Section 611 clearly applied to Krc, who was "assigned to a salary class in the Foreign Service schedule." 22 U.S.C. § 4011; *cf.* Part I–A, *supra,* at 3.

### 3. Egan's Relevance

Our conclusion as to the limited scope of the FSGB's jurisdiction is buttressed by *Department of the Navy v. Egan*, 484 U.S. 518, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988), in which the Supreme Court found that the Merit Systems Protection Board ("MSPB") had no authority to examine the merits of the Navy's denial of a naval base employee's security clearance. According to the Court, an agency's security clearance determination

> is only an attempt to predict [an employee's] possible future behavior and to assess whether, under compulsion of circumstances or for other reasons, he might compromise sensitive information. It may be based, to be sure, upon past or present conduct, but it also may be based upon concerns completely unrelated to conduct, such as having close relatives residing in a country hostile to the United States.

484 U.S. at 528–29, 108 S.Ct. at 824. Describing the grant of a security clearance as a "[p]redictive judgment" that "must be made by those with the necessary expertise in protecting classified information," the Court explained that "the protection of classified information must be committed to the broad discretion of the agency responsible"; "outside nonexpert" bodies cannot, in the Court's view, "determine what constitutes an acceptable margin of error in assessing the potential risk." 484 U.S. at 529, 108 S.Ct. at 825.

As Krc points out, *Egan* does not squarely control the FSGB's authority here. Most importantly, while the Navy denied Egan a security clearance, Krc's security clearance was never officially revoked. Krc retains his clearance for domestic work; the agency has decided only that he will not be cleared for posting overseas.

The *nature* of USIA's decision here, however, is analogous to the Navy's decision in *Egan*. USIA's determination, like the Navy's, represented its "assess[ment] whether, under compulsion of circumstances or for other reasons, [Krc] might compromise sensitive information." *Id.* at 528, 108 S.Ct. at 824. Furthermore, the FSGB, statutorily composed of "independent" citizens "who are not employees of the Department [of State] or members of the [Foreign] Service," 22 U.S.C. § 4135(a), does not appear to be the kind of inside expert body that, *Egan* suggested, might be qualified to review the substance of the agency's decision. *See Egan*, 484 U.S. at 529, 108 S.Ct. at 825. Although Dowling refused to predict whether Krc, if approached by hostile intelligence agencies, would reveal confidential information, Dowling vetoed any future overseas posting for Krc in order to "assure[ ] [him]self that [he] will never have to make that prediction." J.A. 577. Thus, Dowling left himself a large "margin of error in assessing [Krc's] potential risk." *Egan*, 484 U.S. at 529, 108 S.Ct. at 825. *Egan* teaches plainly that review of the breadth of that margin is outside the authority of a nonexpert body such as the FSGB. This reading of *Egan* accords fully with the Tenth Circuit's interpretation, which precluded MSPB and district court review of the merits of the Air Force's suspension of an employee's security clearance, as well as of the nexus between the Air Force's rationale and national security interests. *Hill v. Department of the Air Force*, 844 F.2d 1407, 1411 (10th Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 73, 102 L.Ed.2d 49 (1988).[4]

In sum, the structure of the Foreign Service Act, seen through *Egan*'s lens, persuades us that Krc's termination from the Foreign Service was not grievable before the FSGB. Finding that the Board lacked authority to consider Krc's com-

---

**4.** In *Hoska v. United States Dep't of the Army*, 677 F.2d 131 (D.C.Cir.1982), we reviewed the MSPB's affirmance of the Army's revocation of an employee's security clearance. We reversed on the grounds that the Army failed to show a sufficient nexus between Hoska's conduct and the revocation of his clearance. *Id.* at 144–45. While *Egan*, decided six years after *Hoska*, throws some doubt on *Hoska*'s continued viability, *Hoska* remains distinguishable from the case before us because the Army's revocation decision was explicitly conduct-based. The instant case, therefore, does not require us to reconsider *Hoska* in light of *Egan;* we leave that task for another day.

plaint, we affirm the district court's refusal to enforce the Board's decision.

## B. *APA Claim*

■ In the second count of his counterclaim, Krc contends that USIA's termination decision violated the APA's strictures against agency action that is

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right...;

. . . . .

(D) without observance of procedure required by law; ...

5 U.S.C. § 706(2). We disagree.

The protections accorded by § 706 are available in all cases of agency action

except to the extent that—

(1) statutes preclude judicial review; or

(2) agency action is committed to agency discretion by law.

*Id.* § 701(a). The Foreign Service Act does not preclude judicial review of security clearance revocation or termination decisions by USIA. To prevail on his APA claim, therefore, Krc must demonstrate that USIA's actions in this case were not "committed to [its] discretion by law."

The Supreme Court has explained that § 701(a)(2) applies "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Webster v. Doe,* 486 U.S. 592, 599, 108 S.Ct. 2047, 2051, 100 L.Ed.2d 632 (1988) (quoting *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971)). Under § 701(a)(2), review is precluded "if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Webster,* 486 U.S. at 600, 108 S.Ct. at 2052

(quoting *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985)). Above all, § 701(a)(2) requires us to examine carefully the statute on which the claim of illegal agency conduct is based. *Webster,* 486 U.S. at 600, 108 S.Ct. at 2052.

Section 611 of the Foreign Service Act states that except for reasons of misconduct, the Secretary of State "may terminate at any time" a limited Foreign Service appointment. 22 U.S.C. § 4011. This language imposes fewer shackles on the agency head's decisionmaking than the corresponding provision in the 1947 National Security Act, which the Supreme Court found precluded judicial review. *Webster,* 486 U.S. at 601, 108 S.Ct. at 2052–53.[5] Furthermore, when Foreign Service members raise meritorious grievances and the Board recommends remedial action, the Secretary may reject the Board's recommendation "on the basis of a determination that implementation of the recommendation would be contrary to law *or would adversely affect the national security of the United States."* 22 U.S.C. § 4137(d) (emphasis supplied). We are left with little doubt, therefore, that the Act "fairly exudes deference" to the Secretary when Foreign Service personnel decisions implicate national security. *Compare Webster,* 486 U.S. at 600, 108 S.Ct. at 2052.

■ Krc contends that by requiring "[a]ll personnel actions" to accord with "merit principles," 22 U.S.C. § 3905(a), the Act does provide a "meaningful standard" for review of his termination. We are not persuaded, however. Critically, revocation, modification, or dismissal of a security clearance is absent from the list of "personnel actions" that must conform to "merit principles." *See* 22 U.S.C. § 3905(a).[6]

---

5. Section 102(c) of the National Security Act of 1947, 61 Stat. 498, as amended, states:

[T]he Director of Central Intelligence may, in his discretion, terminate the employment of any officer or employee of the Agency whenever he shall deem such termination necessary or advisable in the interests of the United States.

50 U.S.C. § 403(c) (1982).

6. While Krc's security clearance was never formally revoked, USIA's refusal to approve an overseas posting for him on security grounds was tantamount to a modification of his clearance. The FSGB considered USIA's actions in that light, *see* J.A. 58 (referring to USIA's "decision to revoke Krc's clearance for overseas assignment"); we have no reason to treat it differently.

Even if USIA's action with regard to Krc is construed as a decision related to an "assignment" or "separation," and, consequently, constitutes a "personnel action" to which "merit principles" apply, *see* 22 U.S.C. § 3905(a)(2)(A), (B), those principles do not afford protection from discrimination on the basis of sexual orientation. *See* 5 U.S.C. § 2302(b)(1). Nor, in light of the Act's mandate that Foreign Service officers be "available to serve in assignments throughout the world," 22 U.S.C. § 3901(a)(4), and the unreviewability of USIA's assessment of the national security risk presented by Krc's overseas posting, *see* Part II–A *supra,* do we have authority to rule that USIA's decision not to assign Krc overseas discriminated "on the basis of conduct which does not adversely affect the performance of the employee," 5 U.S.C. § 2302(b)(10). In short, the "merit principles" do not remove Krc's termination from the province of USIA's discretion.

We do find puzzling, however, the trial judge's dismissal of Krc's APA claim without any explanation. *See* May 31 Order, at 2, 5. Nonetheless, the language of § 611, particularly in the context of the Supreme Court's *Webster* decision, coupled with the inapplicability of the "merit principles," powerfully rebut Krc's argument. We therefore affirm the judge's summary dismissal of Count II of Krc's counterclaim.

## C. *Constitutional Claims*

Counts III and IV of Krc's counterclaim asserted that USIA's termination decision deprived him of liberty and property without due process of law. We agree with the judge's dismissal of these contentions.

### 1. Liberty Interest

■ To demonstrate the claim that USIA deprived him of a liberty interest without due process, Krc must show that the agency altered his status in a tangible way, and that an imposition of stigma or injury to reputation accompanied this change in status. *Doe v. Cheney,* 885 F.2d 898, 910 (D.C.Cir.1989); *Doe v. Casey,* 796 F.2d 1508, 1522–23 (D.C.Cir.1986), *aff'd in part and rev'd in part sub nom. Webster v.*

*Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988); *Doe v. Dep't of Justice,* 753 F.2d 1092, 1111 (D.C.Cir.1985). Stated otherwise, this two-pronged standard requires Krc to show a "defamation ... accompanied by a discharge from government employment or at least a demotion in rank and pay." *Mosrie v. Barry,* 718 F.2d 1151, 1161 (D.C.Cir.1983). Krc demonstrates neither discharge nor defamation.

Krc's limited Foreign Service appointment was terminated as of the close of business on March 2, 1985. Although Krc had to file some additional paperwork, he was appointed to USIA's domestic civil service the next day at an annual salary $333 higher than his Foreign Service salary. *See* Declaration of Harlan F. Rosacker, Brief for USIA at ii; J.A. 99. Krc retained his security clearance after the transfer. On this record, Krc's liberty interest claim must fail. Rehired by the same agency the day after his termination from overseas duty in a different capacity but with a pay increase, Krc cannot claim that he suffered a "loss of government employment" sufficient to constitute a constitutionally cognizable change of status. Even if he has lost the opportunity for employment in the Foreign Service, he has retained his job with USIA as well as his salary. *Cf. Mosrie,* 718 F.2d at 1161–62. The "loss of some employment opportunities do[es] not ... amount to an alteration of a legal right," *id.* at 1162, particularly when the loss of employment flows directly from the modification of a security clearance, which itself represents only a change in the terms of an agency's exercise of its discretion. *Egan,* 484 U.S. at 528, 108 S.Ct. at 824; *compare Bartel v. FAA,* 725 F.2d 1403, 1415 (D.C. Cir.1984) (remand to consider assertion of infringement of well-grounded legal right).

Nor can Krc show that "the government has actually stigmatized his ... reputation by, for example, charging [him] with dishonesty, and that the stigma has hampered future employment prospects." *Compare Doe v. Dep't of Justice,* 753 F.2d at 1111. USIA's termination letter explicitly stated that he was not disqualified from any future domestic government employment,

J.A. 107, and the record contains no evidence that Krc's "attractiveness to potential employers" has been reduced. *Perry v. FBI*, 781 F.2d 1294, 1302 (7th Cir.), *cert. denied*, 479 U.S. 814, 107 S.Ct. 67, 93 L.Ed.2d 25 (1986). Nor does Krc assert that the government has disseminated the cause of his termination; his complaint indicates that USIA's finding that he constituted an "intolerable" security risk was communicated to him alone. J.A. 235. *Compare Doe v. Dep't of Justice*, 753 F.2d at 1111–12. In any event, since Krc retains his security clearance for non-overseas use, USIA's actions do not expose him to the risk of other agencies or private employers blindly refusing to hire him on the basis of USIA's security determination. *Compare Doe v. Casey*, 796 F.2d at 1523 n. 67. As Krc makes out neither prong of our liberty interest test, we affirm the district court's dismissal of his liberty interest claim.

### 2. Property Interest

■ Krc contends that his "reasonable expectation of continued employment in the Foreign Service" constituted a property right of which USIA deprived him by terminating him without either a statement of reasons or fair opportunity to challenge the termination. J.A. 235. He derived his "reasonable expectation" from USIA's own regulations, which, he claims, permit termination of his employment solely for unsatisfactory performance or for such cause as will increase the efficiency of the Foreign Service. Brief for Appellant ("Krc Br.") 44; Reply Brief for Appellant 13. Having failed to demonstrate that his conduct reduced the Service's efficiency, he argues, USIA did not meet its own criteria for termination.

Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source...." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The Foreign Affairs Manual ("F.A.M.") spells out the parameters of the property rights in employment enjoyed by Foreign Service Limited Appointees, such as Krc:

> An employee with a *Foreign Service Limited* appointment may be separated on a date specified in the personnel action effecting the employee's appointment; when the program for which the employee was appointed expires; when the need no longer exists for the employee's services; or when the employee fails to perform duties satisfactorily.

3 F.A.M. § 712 (1984) (emphasis in original). This provision accords with other official guidelines and manuals providing that limited appointees may be terminated "for such cause as will promote the efficiency of the Service." *See, e.g.*, 22 U.S.C. § 4010(a)(1); 3 F.A.M. § 767.1; USIA Manual of Operations and Administration § 351.4(d) (1984); *see also id.* § 454.5(t) (performance evaluations may not discuss "[o]utside activities which are not relevant to performance or post effectiveness"). Career candidates who complete their probationary limited appointment "can be expected to be commissioned as Foreign Service Officers by the 4th year of their probationary appointment, following approval by the Commissioning and Tenure Board." United States Department of State, *et al.*, *Foreign Service Careers* 13 (June 1984).

These guidelines suggest that Krc's property interest in his limited appointment is a circumscribed one. *Cf. Colm v. Vance*, 567 F.2d 1125, 1129–32 (D.C.Cir.1977) (describing limited property right of Foreign Service members during time-in-class period). Subject to the "merit principles" governing "personnel actions," *see* 22 U.S.C. § 3905; *Colm*, 567 F.2d at 1131–32; Part II–A, *supra*, USIA retains discretion to determine "when the need no longer exists for the employee's services" or when continued employment would not "promote the efficiency of the Service." Krc concedes that he could be terminated for "such cause as will promote the efficiency of the Service." 22 U.S.C. § 4010(a)(1); Krc Br. 44. Since Foreign Service members "should be ... available to serve in assignments throughout the world," 22 U.S.C. § 3901(a)(4), the continued employment of a member whose overseas security clearance has been revoked would not "promote the efficiency of the Service." Provided that

USIA notifies the employee by letter at least thirty days before the impending separation, 3 F.A.M. § 715, withdrawal of a member's overseas security clearance furnishes grounds consistent with the merit principles for USIA to determine that "the need no longer exists for the employee's services." Unfortunately for Krc, since no independent property right attaches to the security clearance, the merits of USIA's withdrawal of a security clearance are beyond review. *Egan,* 484 U.S. at 528–29, 108 S.Ct. at 824–25; *see* Part II–A, *supra.*

By letter dated January 25, 1985, USIA's Personnel Director informed Krc that his limited appointment would be terminated effective February 28, 1985; in light of the decision by USIA's Security Director that Krc "cannot be given any overseas assignment," the Personnel Director concluded that "there is ... no need for your services in the Foreign Service." J.A. 107. Having timely notified Krc of his impending termination, and having terminated him on a ground expressly provided in its own regulations, USIA did not deprive Krc of property without due process. We therefore affirm the trial judge's dismissal of Krc's property interest claim.

### D. *Other Constitutional Claims*

According to Krc, the district court failed to consider his claim that USIA's termination decision denied him equal protection. We agree, and therefore remand this issue to the district court.

■ In Count II of his initial August 1987 counterclaim, Krc alleged that USIA's actions violated the APA in part because they were "contrary to constitutional right." J.A. 234–35. Concluding from the district court's April 20, 1989 opinion that this opaque phrase had not alerted the court to his equal protection claim, Krc filed an amended counterclaim on May 1, 1989, spelling out explicitly in Count V his equal protection argument. J.A. 238, 246–47. This amended counterclaim, however, was never docketed, *see* J.A. Tab 1, and the

district court made no reference to Count V in its May 31 Order.

The district court's failure to consider the amended counterclaim was error. Under the Federal Rules of Civil Procedure, parties may amend their pleadings "once as a matter of course at any time before a responsive pleading is served...." Fed.R. Civ.P. 15(a). Motions for summary judgment or dismissal, however, do not constitute responsive pleadings that prevent a party from amending without leave of court. 6 Wright & Miller, *Federal Practice and Procedure* § 1483, at 585–87 (1990); *Horn & Hardart Co. v. National Rail Passenger Corp.,* 843 F.2d 546, 549 (D.C.Cir.), *cert. denied,* 488 U.S. 849, 109 S.Ct. 129, 102 L.Ed.2d 102 (1988) (motion to dismiss is not a responsive pleading). USIA never answered Krc's original counterclaim, but filed only motions for summary judgment and dismissal. As of May 1, moreover, the court was still considering two counts of the initial counterclaim. *Cf.* 6 Wright & Miller, *supra,* at 588–91 (parties may generally amend as of right within reasonable time after order dismissing complaint entered). Krc, therefore, retained the right to amend his counterclaim on May 1, and his amended counterclaim was properly before the district court.

On June 2, 1989, Krc moved to file a second amended counterclaim, apparently to spell out his equal protection claim more fully. On July 21, the district court denied the motion on the grounds that the court had no more jurisdiction, having ordered the case dismissed from the court's docket on May 31. *United States Information Agency v. Krc,* No. 87–1740 (D.D.C. July 21, 1989) (order). Since the court should have considered Krc's May 1 amended counterclaim, Krc's June 2 motion was irrelevant. We therefore vacate the court's July 21 order.

As noted, the court's May 31 order was silent as to Krc's equal protection claim—Count V of his amended counterclaim. It also made no mention of Count VI of his amended counterclaim,[7] which alleged that

---

7. This Count is styled "Count IV" but appears after Count V. We assume that "Count IV" is a typographical error and should read "Count VI."

USIA "deterred and prevented [Krc] from pursuing other part-time or full-time employment opportunities outside USIA." J.A. 247–48. Both of these claims should be considered in the first instance by the district court. We therefore remand the case for the court's consideration of these two claims.

### III. CONCLUSION

To sum up: we affirm the district court's denial of enforcement of the FSGB's order, as well as the court's dismissal of Krc's APA, liberty-interest, and property-interest claims. We remand for the district court to consider Krc's claims concerning equal protection and interference with pursuit of employment—Counts V and VI of his amended counterclaim.

A final word, however, is in order. The statutorily ordained unreviewability of USIA's security clearance determination, coupled with the breadth of the agency's discretion in termination decisions concerning limited appointees, underscore the critical importance of judicial authority to consider the constitutional claims resulting from agency personnel decisions. As this case illustrates, those constitutional claims may well be the *only* check on agency actions that determine a person's career fortunes. Courts have an obligation to listen to those claims clearly and to consider them carefully. *See Webster v. Doe*, 486 U.S. at 601, 108 S.Ct. at 2052–53. We urge the district court to consider our remand in this light.

*So ordered.*

Separate Statement of WALD, Chief Judge:

I think the analysis and result of the court's opinion are consistent with the statutory scheme that Congress has established. Nevertheless, I find highly disconcerting the notion that government agencies can terminate outstanding civil servants without any substantive review simply by invoking "national security." The possibility of unreviewable agency "security officers" giving effect to homophobic or other biases is all too apparent. Congress clearly has the authority to provide for substantive review of security clearance determinations, *Department of the Navy v. Egan*, 484 U.S. 518, 530, 108 S.Ct. 818, 825–26, 98 L.Ed.2d 918 (1988); I hope that this case will encourage it to consider such a course.

Separate Statement of MIKVA, Circuit Judge:

I share the concerns expressed by Chief Judge Wald in her separate statement. No one can be comfortable with the process that has been afforded the federal employee in this case, even though it may be all the process that is due under the statute. I too hope that Congress will revisit the statutory scheme and provide federal employees with a better plan.