UNITED STATES INFORMATION AGENCY

v.

**Jan KRC, Appellant.**

**No. 91–5339.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 13, 1992.

Decided April 9, 1993.

Richard Laird Hart, with whom Arthur B. Spitzer, Washington, DC, was on the brief, for appellant.

Edward R. Cohen, Attorney, Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Barbara L. Herwig, Washington, DC, were on the brief, for appellee.

Before WALD, D.H. GINSBURG, and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

Opinion dissenting in part filed by Circuit Judge WALD.

D.H. GINSBURG, Circuit Judge:

This appeal arises from a decision by the United States Information Agency to terminate the Foreign Service appointment of Jan Krc. The USIA Office of Security (USIA–OS or OS) determined that Krc posed a security risk because of certain homosexual relationships he had had during his assignment in Belgrade. Krc alleges that the USIA violated his right to equal protection, tortiously interfered with his prospective employment prospects, and interfered with his civil service career in violation of § 1103 of the Foreign Service Act, 22 U.S.C. § 4133(a). The district court granted summary judgment for the USIA on the equal protection claim, and as to the latter two claims, held that it lacked jurisdiction or, in the alternative, that the USIA was entitled to summary judgment. We

affirm the district court's grant of summary judgment on the equal protection and tort claims and its dismissal for lack of jurisdiction of the statutory claim.

## I. BACKGROUND

Krc entered the Foreign Service with a limited appointment in 1982, and in 1983 was posted to Yugoslavia. While Krc was in Yugoslavia, the USIA Office of Security received certain information, classified "Secret," regarding him. (The Government has filed the Secret information with this court under seal.) When the USIA debriefed Krc at the end of his posting in 1984, it undertook to find an explanation for this Secret information. During this debriefing, Krc revealed that while in Yugoslavia, he had engaged in homosexual conduct with a number of partners, including not only other Foreign Service officers (FSOs) but also the assistant military attache of a non-NATO European country and two nationals of a Communist country.

In October 1984 after an investigation the USIA Personnel Director, Angie Garcia, informed Krc that she intended to terminate his Foreign Service appointment; his sexual relationships, she wrote, "demonstrate[d] insubordination, irresponsibility, poor judgment and lack of discretion." In December 1984, however, upon hearing Krc's version of what he was told at a briefing about USIA's fraternization policy barring sexual relations with East Bloc nationals, Garcia decided to issue only an official letter of reprimand "based on the poor judgement [sic] and indiscretion demonstrated by [Krc's] actions." Shortly thereafter, the USIA Director of Security, Bernard Dowling, informed Garcia that he would "not approve any foreign service assignment of Mr. Krc because of the strong security risk involved." Dowling explained that Krc "not only showed poor judgment and lack of discretion" while in Yugoslavia but "also committed acts which we feel make him a security risk in any foreign service assignment," namely "engaging in homosexual relationships with eight different men, including two citizens of Yugoslavia."

Because Dowling refused to approve any future overseas assignments for Krc, Garcia informed him that she was terminating his Foreign Service appointment pursuant to § 611 of the Foreign Service Act. On March 2, 1985, the USIA officially terminated Krc's appointment to the Foreign Service and appointed him to a position in its domestic civil service (at a slightly higher annual salary). The USIA never revoked Krc's security clearance.

Krc filed a complaint with the Foreign Service Grievance Board challenging the termination of his Foreign Service appointment. In March 1987 the FSGB ordered Krc reinstated in the Foreign Service. The USIA sued in District Court to set aside the FSGB's order, and Krc counterclaimed, seeking enforcement of the FSGB's order and alleging that the USIA's failure to comply with the order violated the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*, and the Due Process Clause of the Fifth Amendment.

Meanwhile, Krc began to pursue job opportunities elsewhere. In 1988 he tried to secure part-time work with a contractor working for the Defense Intelligence Agency. Krc could not be authorized for such work, however, until the Defense Industrial Security Clearance Office (DISCO) converted his security clearance into an industrial security clearance. In May 1988 DISCO submitted to the USIA–OS a form letter inquiring whether any "adverse information was developed subsequent to issuance" of Krc's security clearance. The OS answered in the affirmative, after which Krc was not hired for the job. As a result, Krc added a new counterclaim, alleging that by advising DISCO of "adverse information" about him, the USIA tortiously interfered with his prospective employment opportunities and business advantage.

The district court granted the USIA's motion to set aside the FSGB's order and dismissed the APA and due process counterclaims. The Court of Appeals affirmed, but remanded for the district court to consider Krc's equal protection and tortious interference claims. *United States Infor-*

*mation Agency v. Krc,* 905 F.2d 389 (D.C.Cir.1990). Meanwhile, in February 1990 Krc applied for an excursion tour to a United States consulate in Czechoslovakia, but the OS refused to clear him for that position. On remand, Krc added a third counterclaim, alleging that the USIA had refused to approve him for the excursion tour in retaliation for his earlier grievance and had therefore interfered with his civil service career in violation of § 1103 of the Foreign Service Act, 22 U.S.C. § 4133(a).

## II. ANALYSIS

As indicated above, the district court denied Krc relief on all counts. We affirm that judgment for the reasons that follow.

### A. *Equal Protection*

Krc alleges that his termination from the Foreign Service "deprived [him] of the equal protection of the law in violation of the Fifth Amendment." Specifically, Krc contends that the USIA discriminated against him on the basis of "his sexual orientation and conduct, factors that have no relationship to [his] ability to perform the duties of a Foreign Service officer or to his trustworthiness and loyalty to the United States." After reviewing the record and the Secret information submitted *in camera,* the district court found that the USIA had terminated Krc not on account of his sexual orientation but solely on account of his particular conduct and that the USIA had a rational basis for doing so. The district court therefore granted the USIA's motion for summary judgment on the equal protection claim.

■ In *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the Supreme Court outlined the showing that a plaintiff must make in order to prove intentional discrimination. Although *Price Waterhouse* itself was a Title VII sex discrimination suit, the way in which the Court allocated the burden of proof there applies equally to all claims of employment discrimination. *See, e.g., Pontarelli v. Stone,* 930 F.2d 104, 114 (1st Cir.1991) (*Price Waterhouse* applies to § 1983 claim alleging employment discrimi-

nation in violation of the equal protection clause of the Fourteenth Amendment). First, the plaintiff must prove that an illegitimate factor played a substantial role in the challenged employment decision. *See Price Waterhouse,* 490 U.S. at 258, 109 S.Ct. at 1794 (opinion of Brennan, J.); *id.* at 259, 109 S.Ct. at 1795 (White, J., concurring); *id.* at 265, 109 S.Ct. at 1798 (O'Connor, J., concurring). If the employee makes that showing, then he or she will prevail unless the employer proves that it would have made the same decision even in the absence of the impermissible factor, an affirmative defense. *See id.* at 244–45, 109 S.Ct. at 1787–88 (opinion of Brennan, J.); *id.* at 259–60, 109 S.Ct. at 1795–96 (White, J., concurring) (quoting *Mt. Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1987)); *Price Waterhouse,* 490 U.S. at 276–77, 109 S.Ct. at 1804–05 (O'Connor, J., concurring).

■ In this case, it is clear that the USIA would have terminated Krc from the Foreign Service on the basis of his conduct, *i.e.,* regardless of his sexual orientation. Therefore, we need not determine whether Krc's homosexuality in fact played a substantial role in the employment decision, nor whether it would have been rational for the USIA to have relied upon his homosexuality in terminating him from the Foreign Service (as opposed to restricting him to assignments in countries where homosexuality is not unlawful or perhaps even opprobrious, *cf. Padula v. Webster,* 822 F.2d 97, 104 (D.C.Cir.1987)).

It is beyond genuine dispute that the USIA would have terminated the Foreign Service appointment of an officer who had heterosexual escapades with the military attache of a neutral country and with nationals of a Communist country. Such behavior reflects appallingly poor judgment and virtually invites an approach from a hostile intelligence service. Although Dowling testified that Krc's sexual activity probably gave rise to the Secret information, Krc alleges that the facts recounted in the Secret information actually arose prior to his sexual dalliances in Yugoslavia, and we assume, as we must, that the plaintiff's

allegation is true. Even so, it is evident that these *liaisons dangereuses* at a minimum aggravated the security concerns raised by the Secret information. Regardless of the order in which they arose, it was clearly the combination of Krc's conduct and the Secret information that prompted the OS to take the steps necessary to insulate him from an approach by a hostile intelligence agency in an uncontrollable foreign environment.*

Moreover, Krc can point to no pattern, or even instance, of USIA disciplinary action to suggest that the agency discriminated against him in his security review on account of his homosexuality. Indeed, the evidence demonstrates that the USIA responds to sexual indiscretions—both homosexual and heterosexual—on a case-by-case basis, and evaluates the totality of the circumstances in deciding how to respond. Thus, in the four instances of record in which an FSO admitted to having engaged in homosexual conduct either with a non-Communist foreign national or with another FSO, the USIA imposed no sanction. The record does not contain an exact heterosexual analogue to Krc's case, *i.e.*, in which the agency had information about a heterosexual FSO similar to the Secret information about Krc and in which the heterosexual FSO had relations with persons who might well be used as informants or be vulnerable to blackmail, such as the Communist nationals and the neutral military attache with whom Krc was involved. In the closest cases of record, of which there are four, an FSO had had a hetero-

* Contrary to our dissenting colleague, *see* Dis.Op. at 1217–19, 1220–21, 1224–25, 1226, this understanding of the record in no way contradicts our earlier decision in this case. In *United States Information Agency v. Krc*, 905 F.2d 389 (D.C.Cir.1990), we held that the FSGB had no authority to review Krc's termination because he "was not terminated for misconduct." *Id.* at 394. That is, Krc's conduct did not necessarily "violate a canon of conduct," *id.*, such as the USIA's fraternization policy, and thus did not constitute "misconduct." But conduct that is not misconduct can have an adverse national security implication. *See, e.g.,* 5 U.S.C. § 7311, Note, Executive Order 10450, at § 8(a)(1) (1988 ed.) (listing a broad array of circumstances relevant to a security determination, including evidence of unreliability, immoral behavior, illness, or "[a]ny facts which furnish reason to believe that the individual may be subjected to coercion, influence, or pressure which may cause him to act contrary to the best interest of the national security"). Conduct that violates no canon may, as here, for example, reflect poor judgment, and that is hardly irrelevant to the USIA's determination about an individual's fitness for Foreign Service duty overseas.

Moreover, when this case was first here, we never suggested that Krc's homosexuality was the sole reason for, or even "a necessary ingredient" in (Dis.Op. at 1225 n. 13), his termination. Nor did we ever say—or even have occasion to say—that Krc's conduct was wholly irrelevant to the USIA's decision to terminate his Foreign Service appointment, as the dissent seems to suggest. *Contra* Dis.Op. at 1217 ("we found as a matter of law that he was not dismissed because of any particular conduct"). Indeed the record makes clear that several factors, especially Krc's ill-advised conduct, contributed to the agency's decision to terminate Krc's Foreign Service appointment. *Compare McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802–804, 93 S.Ct. 1817, 1824–1825, 36 L.Ed.2d 668 (1973) (test for proving intentional discrimination where single reason motivates employment decision) *with Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (test for establishing discrimination in "mixed motive" case). Originally Garcia said she was terminating Krc's appointment because he had "demonstrate[d] insubordination, irresponsibility, poor judgment and lack of discretion." In refusing to approve him for posting overseas, Dowling later cited Krc's "poor judgment and lack of discretion" (as evidenced by his conduct in Yugoslavia) as well as "his homosexuality." *Accord* Dis.Op. at 1223 (referring to "Dowling's three-pronged explanation" for Krc's termination).

Assuming *arguendo* that Krc's sexual orientation was one "significant" factor in the USIA's employment decision, as the dissent argues at length, *see* Dis.Op. at 1219, 1222, 1222–25, 1225–26, and that it was an illegitimate factor, the USIA would still prevail under *Price Waterhouse* if, as it claims, it would have terminated Krc's appointment based solely upon its other, unquestionably legitimate reasons for doing so. *See Price Waterhouse*, 490 U.S. at 244–45, 109 S.Ct. at 1787–88 (opinion of Brennan, J.); *id.* at 259–60, 109 S.Ct. at 1795–96 (White, J., concurring); *id.* at 276–77, 109 S.Ct. at 1804–05 (O'Connor, J., concurring). Therefore, contrary to the dissent, we are not "simply pick[ing] from the menu the most delectable item for [our] legal theory." Dis.Op. at 1223. Rather, like the district court before us, *see United States Information Agency v. Krc*, No. 87–1740, at 4–5, 1991 WL 166683 (D.D.C. Aug. 12, 1991) we think it perfectly clear that the USIA would have terminated Krc's Foreign Service appointment based solely upon the legitimate reasons it gave—*i.e.,* Krc's sexual indiscretions in combination with the Secret information regarding him.

sexual tryst with a foreign national in a hostile country. The USIA suspended the security clearances of all four FSOs and in one instance terminated the FSO's employment as well. In sum, the uncontradicted evidence leads overwhelmingly to the conclusion that Krc's "termination resulted ... from the [USIA's] individualized determination that his own case represented a threat to ... national security." *See Doe v. Gates*, 981 F.2d 1316, 1324 (D.C.Cir. 1993).

The simple fact is that Krc's conduct portrayed abysmal judgment and exacerbated the security concerns induced by the Secret information. Therefore, it is most unlikely that the USIA would have posted him abroad regardless of his sexual orientation. An FSO who cannot serve abroad is a contradiction in terms. Accordingly, Krc was not denied equal protection of the law.

**B.** *Interference with Prospective Employment Prospects*

■ Krc alleges that by advising the DISCO that it had developed "adverse information" about him, the USIA prevented him from pursuing another employment opportunity and intentionally interfered with his prospective employment opportunities and business advantage. In his complaint Krc requested both injunctive and monetary relief, but he subsequently withdrew all claims for monetary damages.

Although a claim for monetary damages would clearly be barred by sovereign immunity, *see* 28 U.S.C. § 2680(h) (Federal Tort Claims Act does not waive sovereign immunity for "claims arising out of ... interference with contract rights"); *Art Metal–U.S.A., Inc. v. United States*, 753 F.2d 1151, 1155 (D.C.Cir.1985) ("claims for interference with prospective advantage are ... claims arising out of interference with contract rights"), whether sovereign immunity bars Krc's claim for injunctive relief is not quite so easily answered. We start with the Administrative Procedure Act, which provides: "Nothing herein ... confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Relying

upon *Sharp v. Weinberger*, 798 F.2d 1521 (D.C.Cir.1986), the USIA argues that the Federal Tort Claims Act impliedly forbids specific relief for tortious interference with prospective employment opportunities. In *Sharp* we held that "[t]he waiver of sovereign immunity in the [APA] does not run to actions seeking declaratory relief or specific performance in contract cases" because, by expressly providing for money damages as the "sole remedy" for contractual breach by the federal government, "the Tucker Act and the Little Tucker Act impliedly forbid [specific] relief." *Id.* at 1523. Here, in contrast, the FTCA specifically bars money damages as a remedy for Krc's claim, which by parity of reasoning implies that injunctive relief is available. Moreover, Krc does not seek specific performance of a contract, and the relief he does seek would impose a far lesser burden upon the Government than would an equitable action for breach of contract. Therefore, we conclude that the district court erred in finding that sovereign immunity bars Krc's request for specific relief.

■ The district court also held, in the alternative, that the USIA was entitled to summary judgment because its answer to the DISCO's inquiry regarding adverse information relevant to Krc's security clearance "was no more than an accurate response." We agree. "[T]here is a general duty not to interfere intentionally with another's reasonable business expectancies of trade with third parties ... unless the interference is not improper under the circumstances." *Art Metal*, 753 F.2d at 1154–55 (quoting RESTATEMENT (SECOND) OF TORTS § 766 comment b (1979)). The USIA's action was clearly "not improper under the circumstances." The USIA is authorized to disclose "relevant data" to "duly authorized security agencies" regarding "significant security information in the file of a USIA employee." 55 Fed.Reg. 31963 (August 6, 1990).

Furthermore, "adverse information" clearly had come to light subsequent to issuance of Krc's security clearance: the USIA had learned that he had had sexual relations with the military attache of a

neutral country and with two nationals of a Communist country during his stint in Belgrade. This information can only be characterized as "adverse" because it shows such poor judgment on the part of an FSO with access to highly classified material that it caused the USIA to terminate his Foreign Service appointment. There is therefore no genuine issue of material fact relevant to Krc's claim of improper interference, and we affirm the district court's grant of summary judgment.

## C. *Reprisal*

■ Krc claims that the USIA refused to approve him for an excursion tour in Czechoslovakia in retaliation for his grievance, and thereby restrained, harassed, or otherwise interfered with Krc and his career, in violation of 22 U.S.C. § 4133(a). The district court correctly held that it lacked jurisdiction over this claim.

The alleged reprisal occurred after Krc's Foreign Service appointment had been terminated. Although a current member of the Foreign Service may file a grievance for an "action alleged to be in the nature of reprisal," 22 U.S.C. § 4131(a)(1)(F), a former member such as Krc may file a grievance "only with respect to allegations described in section 4131(a)(1)(G)," 22 U.S.C. § 4132, to wit "denial of an allowance, premium pay, or other financial benefit." 22 U.S.C. § 4131(a)(1)(G). Krc is thus barred from seeking an administrative remedy for his reprisal claim.

In withholding an administrative remedy from a former FSO alleging reprisal, it appears that the Congress intended also to deny him a judicial remedy. The Supreme Court considered a similar situation in *United States v. Fausto,* 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988). There the Court held that by precluding administrative review of dismissals of employees in the excepted service, the Civil Service Reform Act "displays a clear congressional intent to deny the excluded employees ... judicial review ... for personnel action[s] covered by" the CSRA. *Id.* at 447, 108 S.Ct. at 673. *See also Block v. Community Nutrition Institute,* 467 U.S. 340, 347,

104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984) (holding that Agricultural Marketing Agreement Act, which provides for administrative review at the instance of milk handler affected by a milk marketing order but not at the instance of consumer so affected, by implication precludes consumer from obtaining judicial review of order).

Like the CSRA, the Foreign Service Act provides "a comprehensive system for reviewing personnel action[s] taken against federal employees." *Fausto,* 484 U.S. at 455, 108 S.Ct. at 677; *see also* Senate Report No. 96–913, *reprinted in* 1980 U.S.Code Cong. & Admin.News 4419 ("Foreign Service Act is intended to be a companion measure" to the CSRA). Yet the Act clearly precludes an administrative grievance by a former FSO alleging reprisal. As in the CSRA, these factors "combine to establish a congressional judgment that [a former FSO] should not be able to demand judicial review" for a reprisal claim. *See id.* at 448, 108 S.Ct. at 674.

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court is

*Affirmed.*

WALD, Circuit Judge, dissenting in part:

When this case was before us earlier, we said quite specifically that the United States Information Agency's ("USIA") decision not to clear Jan Krc for foreign assignments—the critical determination that led directly to his discharge from the Foreign Service—stemmed from Krc's sexual orientation, not from any lack of judgment evinced by his sexual conduct: "*Although* Bernard Dowling, USIA's Director of Security, felt that Krc's 'conduct [in Yugoslavia] ... showed poor judgment and lack of discretion,' Dowling decided not to approve future overseas postings for Krc because of his belief that Krc's 'homosexuality would make him an extremely likely security target for hostile intelligence approaches.'" *United States Information Agency v. Krc,* 905 F.2d 389, 394 (D.C.Cir. 1990) (emphasis added; brackets and ellipsis in original) (quoting January 11, 1985

memorandum from Dowling to Angie Garcia, USIA Personnel Director). Indeed this finding was essential to the government's success in the earlier appeal because the Foreign Service Grievance Board ("FSGB"), which had ordered Krc reinstated in the Foreign Service, only had authority to review Krc's dismissal if it was based on "misconduct." *See id.* Relying on Dowling's memorandum predicating security risk on the fact of Krc's homosexual status, we found as a matter of law that he was not dismissed because of any particular conduct, much less the type of "misconduct" necessary to invoke the FSGB's jurisdiction. *See id.* (noting that Krc was terminated because Dowling "believed that his homosexuality made him 'an intolerable security risk,' not because Krc had violated a canon of conduct" (internal citation omitted) and concluding that, because the dismissal was based on Dowling's status-based concerns, "Krc's termination was not conduct-based"). We remanded to the district court, however, for consideration of several of Krc's remaining properly pleaded claims that the trial court had not previously addressed on the merits.

On this go-around, my colleagues, reviewing the decision of the district court on one of those claims, *i.e.*, that the USIA violated Krc's rights under the equal protection component of the Fifth Amendment by dismissing him because of his homosexuality, now inexplicably take an entirely different view of why he was discharged. On the basis of essentially the identical record before us the first time, *see* USIA Brief at 13 n. 8 (acknowledging that USIA did not present district court with new material after remand), they find not only that Krc's homosexuality was not *the* reason for the USIA's negative security appraisal and eventual discharge of Krc, but also that it is "beyond genuine dispute," *see* Court Opinion ("Ct. Op.") at 1215, that Krc's sexuality was not even *a* reason, *i.e.*, that his sexual orientation was entirely superfluous to the USIA's determination that he was a security risk. That is, even if the fact of Krc's homosexuality played some role in the USIA's decisionmaking, it did not *cause* Krc's discharge because, undisputedly, Krc's indiscreet sexual conduct combined with "undisclosed" secret information about him (information that USIA security personnel admit would not by itself justify the action taken against Krc) would have compelled the USIA's Office of Security to reject him for all foreign assignments. *See id.* This startling re-reading of the record results in the defeat of any tenable equal protection claim by Krc because it denies him the benefit of a trial in which he might seek to prove that a substantial and necessary factor in his discharge was in fact his sexual orientation.[1]

The majority's new causal conclusion flatly contradicts our earlier finding that Krc's discharge was not based on misconduct because it was based on his sexual orientation. I would have thought that finding came close to, if indeed it did not actually qualify as, the law of the case; certainly it should have been enough to preclude us from finding on the basis of essentially the same record the exact *opposite* as proven beyond any genuine factual dispute for purposes of summary judgment.[2]

---

1. Of course, under the current law of equal protection, even if a homosexual plaintiff can show that his sexual orientation caused a specific governmental decision, the government can escape liability if it can prove that its consideration of that factor was rational in the circumstances.

2. Even if, as my colleagues argue, a discharge based on "conduct"—as opposed to "misconduct"—also lies outside the FSGB's jurisdiction, *see* Ct. Op. at 1215, n. *, that fact is not relevant here. While the conduct/misconduct distinction might also have led us to the conclusion that the FSGB had no authority to review a

discharge, *that was not the path we took when this case was last before us.* As shown in the text, our previous holding that the USIA's action was not based on misconduct sprang directly from our conclusion that the discharge was status-based, not from any belief that the dismissal was based on "conduct" that fell short of "misconduct." *See also* 905 F.2d at 395 n. 4 (contrasting Krc's case with a prior decision of this court in which a security clearance revocation was "explicitly *conduct*-based") (emphasis added). Thus, contrary to my colleagues' suggestion, *see* Ct. Op. at 1215, n. *, a finding that Krc was fired because of his conduct does contradict our earlier decision. At any rate, the

But even apart from its collision with our earlier interpretation of the events surrounding Krc's discharge, the new explanation for his discharge flouts established principles governing the requirements for an award of summary judgment. To retain his right to a trial, Krc need only point to *some* minimal evidence that, viewed in the light most favorable to him, would permit a reasonable factfinder to conclude that the USIA's determination that he was a security risk was caused by the fact that Krc is an acknowledged homosexual. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986); *cf. Doe v. Cheney*, 885 F.2d 898, 910 n. 10 (D.C.Cir.1989) (upholding summary judgment on an equal protection claim where plaintiff brought forth *no* evidence disproving defendant's showing that it was the indiscriminate nature of sexual activity, not its homosexual nature, that led it to conclude that plaintiff was a security risk). Krc's evidence, moreover, must be reviewed in the context of a situation in which the USIA, not Krc, bears the burden of proving that its Office of Security would have done the same thing regardless of Krc's sexual orientation. *See* Ct. Op. at 1214; *Anderson*, 477 U.S. at 254, 106 S.Ct. at 2513 ("[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden."); *see also Kozup v. Georgetown University*, 851 F.2d 437, 439 (D.C.Cir.1988) ("Where, as here, the plaintiff is under no heightened burden of proof ..., it takes but little evidence to create the necessary issue for trial.").

I find it difficult to comprehend how the record can be read to show other than that Krc has mustered more than sufficient evidence to clear the summary judgment threshold, *i.e.*, a showing that there are

material facts in dispute. For now, I will highlight only a portion of the factual evidence in the record that must defeat the majority's finding of no genuine dispute about the nonhomosexuality related cause of Krc's discharge. Bernard Dowling, the USIA's Director of Security, explained his own decision not to approve Krc for postings abroad by alluding specifically to Krc's homosexuality—the fact that Krc had been "open" about his sexual orientation to Yugoslavs as well as the fact that *homosexual* conduct was illegal in many countries. Neither fact, of course, is at all related to Krc's specific sexual *conduct* while in Yugoslavia. Additionally, Krc proffered sworn testimony that another member of the USIA's Security Office said that Krc's "problem" was not just his specific sexual conduct, but also his "sexual preference," a "type of behavior" the Foreign Service does not "condone." Finally, several other witnesses stated in depositions that, months after Krc's termination, Dowling, the sole decisionmaker in this case, suggested during an official training seminar that he considered homosexuality per se a disqualification for employment in the Foreign Service. This evidence and more, spelled out below, go far beyond the minimal showing of disputed fact necessary to make summary judgment on the causal issue of Krc's discharge totally unjustified.[3]

## I.

Jan Krc, a naturalized American born in (what was then) Czechoslovakia, received a limited appointment as an officer candidate in the Foreign Service in 1982. The official policy of the Foreign Service considers an applicant's sexual practices—heterosexual or homosexual—relevant only to the extent they reflect on the applicant's character or

important point is not that our prior conclusion on the cause of Krc's discharge is determinative for all time, but, rather, that it renders inexplicable my colleagues' present conclusion that a directly contrary reading of the record is proved beyond any genuine dispute.

**3.** Although I agree that sovereign immunity is not a bar to Krc's interference with employment

claim, *see* Ct. Op. at 1216, my colleagues' conclusion that summary judgment is nevertheless appropriate on that question rests on the same inaccurate premise as their disposition of the equal protection claim: that there can be no genuine factual dispute as to the truth of the assertion that Krc's poor judgment caused the USIA to terminate him. *See id.* at 1217. I concur on the reprisal claim.

susceptibility to undue influence; thus, Krc was never asked about his sexual orientation during the application process and saw no need to volunteer that information. (In contrast, when applying to the CIA in 1981, Krc, voluntarily told an interviewer that he was gay because he believed that his sexual orientation was relevant to that agency's evaluation of his application.)

In 1983, after completing basic training, Krc was assigned to work with the USIA in (again, what was then) Yugoslavia. Krc took leave in December of that year to visit relatives in Czechoslovakia and Hungary. Upon his return to Yugoslavia, "secret" [4] information concerning him came to the attention of the USIA's Security Office in Washington. Embassy officials in Yugoslavia discussed that information with Krc several times in early 1984. During those sessions, however, Krc was never questioned about his sexual conduct; in fact, Krc was told that the embassy was not concerned with "finding out who[m] [he] was sleeping with." Krc was also assured that the "secret" information did not reflect poorly on him, and he continued his normal routine of duties.

Krc's posting expired in the summer of 1984. On returning to Washington, he was "debriefed" by Robert Reinhold, a USIA security officer. During that session, Krc was queried for the first time by the USIA about his sexual orientation. When Krc forthrightly told Reinhold he was homosexual, that bare acknowledgement, in Reinhold's own words, constituted "testimony against interest." Reinhold then questioned Krc extensively about his homosexual conduct; Krc told him that he had engaged in brief sexual relationships with other Foreign Service officers, two Yugoslavs, and a Swedish foreign officer.[5]

Krc's statements to Reinhold led directly to two separate attempts formally to separate him from the Foreign Service. First, the USIA's Office of Personnel sought to terminate Krc because of his "misconduct which demonstrates insubordination, irresponsibility, poor judgment, and lack of discretion." In an October 3, 1984 letter to Krc, Angie Garcia, the Director of USIA's Office of Personnel, announced that the reason for Krc's proposed discharge was that he had disobeyed a fraternization policy prohibiting sexual conduct with Communist country nationals, in this case, Yugoslavs. However, after Krc demonstrated to Garcia that the fraternization policy communicated to him in Yugoslavia proscribed only "deep emotional involvements"—not casual sexual relations of the sort Krc had engaged in—the USIA quickly backed off its proposal to terminate Krc's appointment. On December 11, 1984, Garcia wrote a letter to Krc stating that, as a result of her own research and Krc's presentation, she had decided that the evidence would not support his termination from the Foreign Service. In lieu of a discharge, Garcia gave Krc the proverbial slap on the wrist: for Krc's "poor judgment and indiscretion," he received a letter of reprimand that would be expunged from his file after, at most, two years.

Thinking the matter closed, Krc then bid on and was selected for a position in the Philippines. On January 11, 1985, however, before Krc could report to his new post, Dowling sent a memorandum to Garcia stating that Krc's "homosexuality" made him a likely target for hostile intelligence approaches and thus he would not be "approved" for any foreign assignments. To support that risk appraisal, Dowling's memorandum relied not only on Krc's sexual conduct, but also on the fact that he had

**4.** This information has been submitted to the court under seal and cannot be discussed in this opinion. I emphasize, however, that Krc was told that the information by itself did not reflect adversely on him, and Dowling has stated that the USIA would have taken no action against Krc based on this information alone.

**5.** Interestingly, it was Krc's encounters with other Foreign Service officers—and the other offi-

cers' identities—that piqued Reinhold's interest, *not* Krc's relationships with the Yugoslavs (the conduct which my colleagues now find reflects "appallingly poor judgment" and has such strong security implications, *see* Ct. Op. at 1214). Reinhold spent over four hours questioning Krc about his relations with other Foreign Service officers; by contrast, only a few questions were directed to his relations with the Yugoslavs.

been open about his sexuality and the fact that homosexual conduct was illegal in approximately 70 countries.[6] Two weeks later, Garcia informed Krc that his Foreign Service appointment was terminated not because of "disciplinary or performance[ ]" problems, but because the Office of Security refused to approve any foreign postings.[7] The very next day, Krc received a domestic civil service appointment within the USIA; he has remained in that position—with his Top Secret security clearance intact—ever since.

Soon after his separation from the Foreign Service, Krc filed a claim with the FSGB. After a full-scale hearing, that body found no nexus between the considerations highlighted by Dowling or the "secret" information and the interests of national security. Accordingly, it ordered Krc restored to his Foreign Service position. The USIA then sought review of the FSGB order in the district court; Krc counterclaimed for enforcement of the order. He also alleged that his dismissal was in violation of his due process and equal protection rights and that later actions by the USIA constituted interference with prospective employment. The district court, finding that the FSGB had no authority to review the USIA's security clearance determinations, set aside the FSGB's decision and denied all of Krc's counterclaims.

On appeal, we affirmed the district court in its vacation of the FSGB order because we found that Krc's termination was grounded in Dowling's security concerns, which, in turn, were based on Krc's homosexuality per se, *not on any lack of judgment shown by Krc's particular conduct. See* 905 F.2d at 394. Since, as noted, the FSGB had jurisdiction only over discharges based on allegations of "misconduct," we believed the USIA's decision, "even if ... unjustified," *id.,* was not within the FSGB's purview.

At the same time, however, we remanded the case to the district court for further consideration of, among other things, Krc's claim that the USIA's reliance on his homosexuality in its security appraisal violated his equal protection rights. *See id.* at 399–400.

## II.

The district court's decision granting summary judgment against Krc on the equal protection question is before us now.[8] My colleagues conclude that, even assuming the USIA did consider Krc's homosexuality in its security appraisal, the "appalling" lack of judgment demonstrated by his sexual conduct abroad combined with the undisclosable "secret" material in the sealed record made Krc's discharge justifiable to the USIA. *See* Ct. Op. at 1214–16. In other words, under *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), Krc's homosexuality did not *cause* his dismissal because, given the significance of his sexual conduct and the "secret" material, there can be no dispute that the USIA would have terminated Krc regardless of his sexual orientation; any reliance the security officials might have placed on Krc's sexual orientation was, in the USIA's mind, clearly superfluous in light of these other overpowering concerns. *See id.* at 244–45, 109 S.Ct. at 1787–88 (opinion of Brennan, J.) (under Title VII, once a plaintiff shows that an impermissible criterion played a substantial role in an employment decision, employer bears burden of showing that factor did not cause the employment decision "by proving that [the employer] would have made the same decision even if it had not allowed [the impermissible factor] to play such a role"); *id.* at 276–77, 109 S.Ct. at 1804–05 (O'Connor, J., concurring in the judgment) (same). That conclusion is decisive because if Krc's

6. The body of this document is reproduced *infra* at page 1223.

7. Garcia simultaneously vacated the letter of reprimand that she had issued a month earlier.

8. The district court, relying largely on a statement that was not a factual finding in a 1989 pre-remand opinion denying a motion to dismiss, granted the agency's summary judgment motion on the equal protection claim. The majority does not adopt the district court's reasoning but instead derives its own mixed-motive theory to affirm the lower court's decision.

sexual orientation played no determinative role in his discharge, he has no colorable equal protection claim.

But the majority simply cannot deliver in its attempt to wring its orientation-neutral causation finding out of this record. Krc has provided far more than the minimal amount of evidence necessary to put the real cause for his termination in dispute. *See supra* pages 1218–19 (discussing the relatively light burden a nonmoving party faces to prevent summary judgment on an issue on which the moving party bears the burden of proof). First, he has raised a significant question as to whether the USIA would ever have probed into his sexual conduct at all if he had not openly acknowledged his homosexuality. The timing of the USIA's actions against him lends support to his argument. It was Krc's disclosure of his sexual orientation to Reinhold—a disclosure that Reinhold himself termed "against interest"—that triggered the USIA's interest in the specifics of Krc's sexual conduct (and the homosexual conduct of other Foreign Service officers whom Krc could "finger," *see supra* note 5). Up to that point, even after the "secret" information came to the USIA's attention, security officials, still acting under the affirmative belief that Krc was heterosexual, indicated a notable disinterest in "who[m] [Krc] was sleeping with." Thus, the record certainly permits—and may indeed compel—the inference that, absent Krc's acknowledgement of his homosexuality, the USIA would have continued its lack of concern with Krc's private sex life. And, without the provocation of such an interest, Krc obviously would never have been fired because of any alleged lack of judgment with regard to those sexual activities.

In this respect, the case is similar to *Woodward v. United States,* 871 F.2d 1068 (Fed.Cir.1989), *cert. denied,* 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990). There, the Navy obtained summary judgment from the Claims Court on an equal protection claim brought by a discharged gay ensign after showing that review of the ensign's performance record would have led to discharge regardless of his sexuality. *See id.* at 1071. But the Federal Circuit rejected this reasoning because, even if the Navy's assertions were uncontested, it was the plaintiff's acknowledgement of his homosexuality that spurred the review that led to his discharge.[9] *See id.* at 1073–74 ("The facts are clear that ensigns with low rankings were not referred to the reviewing office for reassignment or release. Only because of his homosexuality was Woodward referred for review and, it was, in part, the basis for his release from active duty."); *see also Buttino v. FBI,* 801 F.Supp. 298, 304 (N.D.Cal.1992) (where investigation was undertaken after plaintiff acknowledged homosexual conduct, it was reasonable to conclude that "the very investigation resulting in plaintiff's termination would ... not have been undertaken if plaintiff were not gay"). The facts here require the same result: since there is real dispute as to whether the inquiry into Krc's sexual conduct would have occurred absent his acknowledgement of homosexuality, the record does not support the majority's finding that there is no question of fact that he would have been treated the same way if he were not gay, *i.e.,* if he were an active heterosexual who had engaged in several brief liaisons with fellow officers and Communist country nationals.

Moreover, even if Krc's sexual conduct might have come to light in any case, the record certainly does not support the inference—essential to the majority's conclusion—that the Office of Security would have found the "secret" information—which Dowling himself admits would not by itself warrant action against Krc—and the "poor" judgment shown by Krc's conduct by themselves to compel the drastic penalty of discharge. *See Price Waterhouse,* 490 U.S. at 252, 109 S.Ct. at 1791 (opinion of Brennan, J.) (to rebut showing

---

**9.** The Federal Circuit analyzed this claim under the test of *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). The *Mt. Healthy* standard is very similar to the *Price Waterhouse* test that the majority relies on.

that factor played a substantial role in decisionmaking, the employer must generally present objective evidence "that its legitimate reason, standing alone, would have induced it to make the same decision"); *see also id.* at 276–77, 109 S.Ct. at 1804–05 (O'Connor, J., concurring in the judgment). Here, the objective evidence suggests, rather, that Dowling, the sole arbiter of Krc's security qualifications, thought homosexuality per se was an important and necessary factor in security evaluations in general and in Krc's evaluation in particular. This attitude comes through most directly in Dowling's January 11 memorandum to Garcia announcing that Krc would not be approved for any overseas postings. Dowling wrote:

> I have again reviewed Mr. Krc's security file, particularly his actions at his last overseas post. As you know, he submitted a signed statement to the Office of Security on August 21, 1984 wherein he admitted engaging in homosexual relationships with eight different men, including two citizens of Yugoslavia while he was serving in Belgrade, Yugoslavia. By engaging in such conduct, he not only showed poor judgment and lack of discretion, he also committed acts which we feel make him a security risk in any foreign service assignment. Specifically, he admitted that he had been open about his homosexuality with a number of other Yugoslav nationals with whom he socialized, including those who would obviously be relied upon as informants by hostile intelligence services. Therefore, to allow Mr. Krc to serve in an overseas capacity would be an intolerable security risk since his homsexuality [sic] would make him an extremely likely target for hostile intelligence approaches. Also, in some seventy foreign countries homosexual acts are illegal and punishable by law. Therefore, by [sic] simply engaging in homosexual activity while overseas would place him in violation of the laws of most foreign countries thus further increasing his vulnerability to hostile approaches. Consequently, I will not approve any foreign service assignment of Mr. Krc because of the strong security risk involved.

My colleagues apparently think that Dowling's references to the problems caused by Krc's "openness" about his homosexuality [10] with Yugoslavs and the illegality of homosexuality abroad are gratuitous, and Dowling's "real" reason—the one sufficient in his mind to justify the discharge all by itself—is the one that he mentions first, the indiscretion shown by Krc's specific "homosexual relationships." *See* Ct. Op. at 1214.

But, in granting or reversing a summary judgment, a court cannot simply pick from the menu the most delectable item for its legal theory. Here, the majority cannot select one strand of Dowling's three-pronged explanation and conclude that that arguably neutral factor—and I emphasize that it is not even clear that Dowling would have found heterosexual relationships akin to Krc's homosexual relationships to evince a similar lack of judgment—was alone or in combination with the "secret" material a sufficient reason to the USIA for Krc's discharge. Whether those reasons would have rationally supported Krc's discharge is not the issue here. The issue here is whether there is conflicting evidence in the record as to whether the judgment shown by Krc's sexual conduct together with the otherwise innocuous "secret" information were, in the USIA's view, adequate reasons for Krc's discharge or whether Krc's homosexuality played a necessary role in that decision. *See Price Waterhouse,* 490 U.S. at 252, 109 S.Ct. at 1791 (opinion of Brennan, J.) ("An employer may not ... prevail in a mixed-motives case by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision."); *id.* at 261, 109 S.Ct. at 1796 (O'Connor, J., concurring in the

---

**10.** Dowling has explained that Krc's openness consisted of simply being "candid" about his sexuality among the local embassy community. Since Dowling believes that hiding one's homosexuality invites blackmail and has other negative security consequences, the openness factor in reality applies to all persons of Krc's sexual orientation.

judgment) (same).[11] The Dowling memorandum certainly raises a serious question whether Dowling was relying solely on orientation-neutral factors. When such a crucial document from the "horse's mouth" refers prominently to three factors as leading to a decision, minimally there has to be a genuine question of fact as to whether all of them were essential to that decision. *Cf. Hopkins v. Price Waterhouse*, 920 F.2d 967, 972–73 (D.C.Cir.1990) (employer is liable under Title VII when court cannot distinguish evaluations "tainted" by sexism from those that reflected legitimate concerns).

Thus, in deciding that it is "perfectly clear that the USIA would have terminated Krc's Foreign Service appointment based solely upon the legitimate reasons it gave," Ct. Op. at 1215, n. *, the majority, despite protestations to the contrary, necessarily pulls out the one arguably legitimate strand from the USIA's multifactored explanation and decides that that factor was, beyond dispute, enough in the *USIA's* view to discharge Krc. Moreover, my colleagues' conclusion that this point is "perfectly clear" is not based on a cache of overwhelming contemporaneous record evidence showing that the USIA thought Krc's conduct alone sufficiently egregious to warrant discharge—indeed, their conclusion is not bolstered by *any* contemporaneous record evidence on that point. Rather, my colleagues have simply made their own post hoc surmise as to what must have motivated the USIA years ago, corroborated by at best a few pieces of equivocal evidence about the USIA's decisions in other cases allegedly involving sexual conduct. *See* Ct. Op. at 1214–16; *see also infra* pages 1225–26 (discussing those other cases).

But even if Dowling's express reliance on Krc's homosexuality, by itself, were not enough to create a genuine question of fact about causation, there is additional direct and circumstantial evidence about the agency's reasons for terminating him and, more generally, about its attitude toward homosexuality. One witness swore that a member of the USIA's Security Office told her that Krc's "problem" was not just his behavior, but also his "sexual preference." *See also Doe v. Gates*, 981 F.2d 1316, 1323 (D.C.Cir.1993) (opinion of Sentelle, J.) ("[T]o cast more than metaphysical doubt [and thus survive summary judgment on the defendant's denial of the existence of a policy to discriminate against homosexuals, the plaintiff] should at least have provided some direct evidence of someone having knowledge of that policy asserting it to exist...."). Three other witnesses attested to statements by Dowling made at an official training session held months after Krc's termination suggesting he believed that no homosexuals should be sent abroad by the USIA. One of these witnesses testified that Dowling said that all USIA officers found to be gay are "sent back to America." Another recalled: "[Dowling] said there were three kinds of people or three types—I don't remember the exact words— ... whether he said acceptable or they did not want ... in the foreign service: Drug addicts, alcoholics, and homosexuals."[12] And Dowling himself said on the record that all USIA Foreign Service applicants should be asked whether they have ever engaged in homosexual acts because, in his words, that question "has serious security connotations."

As aforementioned, our own prior reading of the record is in accord with a view of the evidence that Krc's homosexuality was

---

**11.** My colleagues' observation that Krc's "behavior reflects appallingly poor judgment and virtually invites an approach from a hostile intelligence service," Ct. Op. at 1214, adds nothing to the record. The record shows that there is a genuine dispute as to whether the USIA itself *thought that Krc's behavior was sufficiently* egregious to justify termination from the Foreign Service. Again, the relevant inquiry is not what might reasonably justify an employment decision, but what did motivate the employer at the time of the decision.

**12.** Several witnesses also remembered that Dowling created, in their words, a "catch–22." As one put it: "It was ... anyone who is in the closet is [a] blackmail risk and anyone who is in the closet, the implication at least, if he didn't say it, I guess was, should come out with the understanding then that you come out and lose your job."

a vital component in the Office of Security's determination that he was not qualified for foreign assignments. I would have thought we could not have been clearer on this point. To repeat, we said, in a subsection entitled "Reasons for Krc's Termination": "*Although* Bernard Dowling, USIA's Director of Security, felt that Krc's 'conduct [in Yugoslavia] ... showed poor judgment and lack of discretion,' Dowling decided not to approve future overseas postings for Krc because of his belief that Krc's 'homosexuality would make him an extremely likely security target for hostile intelligence approaches.' " 905 F.2d at 394 (emphasis added; brackets and ellipsis in original); *id.* ("Krc was terminated from the Foreign Service because Dowling believed that his homosexuality made him 'an intolerable security risk'...."); *see also id.* at 395 n. 4 (contrasting Krc's case with a prior decision of this court in which a security clearance revocation was "explicitly conduct-based"); *id.* at 397 (rejecting Krc's Administrative Procedure Act claim in part because the statutory guidelines arguably applicable to his discharge did not "afford protection from discrimination on the basis of sexual orientation"). The previous opinion of this court says outright that Dowling's decision, unlike Garcia's earlier aborted attempt to terminate Krc, was not based on Krc's behavior, but on his sexual orientation. *See id.* at 394.[13]

That resolution should presumably be the law of the case, binding us in later phases of the litigation absent the possibility of a " 'grave injustice.' " *See, e.g., Lever Brothers Co. v. United States,* 981 F.2d 1330, 1332 (D.C.Cir.1993) (quoting *Laffey v. Northwest Airlines, Inc.,* 642 F.2d 578, 585 (D.C.Cir.1980)). For, in deciding whether or not Krc's termination was based on "misconduct," and thus whether the FSGB had jurisdiction over Krc's case,

we necessarily concluded as a matter of law that the record would reasonably support no conclusion other than that Krc's homosexuality was the cause of his discharge. *See* 905 F.2d at 394 (stating that "[t]he record presents little reason to question" Garcia's statement that Krc's termination was "not a disciplinary or performance-based action"); *see also supra* note 2 (noting that even if discharges based on "conduct" that is not "misconduct" are also outside FSGB jurisdiction, that distinction is not relevant because our prior decision found that the USIA's decision was based on Krc's sexual orientation).[14]

But even if our earlier finding on this issue would not preclude a later factfinder from reaching a different conclusion after a trial in which witnesses' credibility could be evaluated and conflicting evidence weighed, at the very least it evidences that the record is open to a plausible reading of the USIA's motivation for discharging Krc other than the one my colleagues now find to be so obvious as to merit summary judgment. *Cf. Doe,* 981 F.2d at 1325 (Randolph, J., concurring in part and concurring in the judgment) (where Supreme Court had read the record in a specific way, even if the Court's "opinion in this regard is not the law of the case, it is something sufficiently similar to warrant our respect").

The only conceivable support in the record for my colleagues' new reading is the supposedly even-handed treatment given to homosexual and heterosexual officers in other cases investigated by the USIA's Office of Security. *See* Ct. Op. at 1215. Even taking my colleagues' characterization of these cases at face value, they do not fatally undermine Krc's claim. His claim is that *he* was dismissed because he was gay; not that the USIA dismisses or discriminates against all gay officers. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S.

---

13. My colleagues argue that our previous opinion "never suggested that Krc's homosexuality was the sole reason for or even 'a neccessary ingredient' in his termination." Ct. Op. at 1215, n. * (citation omitted). But I find it impossible to read the opinion as standing for other than that Krc's sexual orientation was at the very least a necessary ingredient in the USIA's decisionmaking, not, as they would now have it, a

factor so marginal that the USIA would have reached the same conclusion in its absence.

14. If we thought that there was any possible factual dispute on this question, we would have sent the case back for a trial on the issue, rather than affirming the district court's judgment in favor of the USIA.

252, 266 n. 14, 97 S.Ct. 555, 564 n. 14, 50 L.Ed.2d 450 (1977) ("[A] consistent pattern of official racial discrimination is [not] a necessary predicate to a violation of the Equal Protection Clause. A single invidiously discriminatory governmental act ... would not necessarily be immunized by the absence of such discrimination in the making of other comparable decisions."); *Bohen v. City of East Chicago*, 799 F.2d 1180, 1187 (7th Cir.1986) ("An equal protection plaintiff ... need not prove a discriminatory policy against an entire class; discrimination against the plaintiff because of her membership in the class is by itself enough."). While evidence of adverse treatment of other members of an allegedly discriminated against group is always helpful, *see id.*, the absence of such evidence is not dispositive especially when, as here, the plaintiff has provided direct and circumstantial evidence that *he* was discriminated against because of membership in a group. *See United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983) (discrimination plaintiff can prove case by direct or circumstantial evidence).

In any case, the cases of discharged officers cited by my colleagues hardly provide the kind of slam-dunk proof that merits summary judgment. The four instances they refer to involving heterosexuals who had security clearances lifted involved sexual conduct that was of a different order and nature from Krc's behavior. In one case, a married officer fathered his secretary's child and had sexual relations with a prostitute from an East Bloc country. In two other cases, officers (one married) violated explicit fraternization policies by having affairs with Communist nationals.[15] And, in the fourth case, a married domestic employee had sex with prominent nationals of foreign countries.

And contrary to my colleagues' assertion, *see* Ct. Op. at 1214–15, there is also

evidence from other security determinations that supports Krc's claim that homosexuality per se played a role in this case. After expressing his opinion that the risk of sending an acknowledged homosexual overseas was "unacceptable," Dowling ultimately denied a security clearance to one gay applicant who was never alleged to have engaged in any indiscreet sexual behavior in part because, in Dowling's words, his "admitted homosexual conduct, ... in an uncontrolled overseas environment may reasonably be expected to subject him to scrutiny and/or entrapment by hostile intelligence services." [16] *See also* Letter of September 1987 from Bernard C. Dowling to Unidentified Applicant (explaining to same denied applicant that the delay in reaching a decision in his case "centered around your admitted homosexuality and your consequent vulnerability, from the standpoint of security, in an uncontrolled overseas environment where hostile intelligence services operate"). Thus, it is clearly a matter of dispute whether other employment decisions at the USIA have been affected by the perceived security effects of homosexuality per se.

### CONCLUSION

Three years ago we returned this case to the district court with an admonition to listen to Krc's equal protection claim with an attentive ear: "[These types of] constitutional claims may well be the *only* check on agency actions that determine a person's career fortunes. Courts have an obligation to listen to those claims clearly and to consider them carefully. We urge the district court to consider our remand in this light." 905 F.2d at 400 (emphasis in original; internal citation omitted). On remand, no new evidence was considered; no new witnesses listened to; summary judgment was awarded on a factual basis rejected by this court in the prior appeal. Now, my colleagues, on a new theory of the case based on an old record, seemingly close their eyes to significant direct evidence

---

**15.** Recall that Krc was initially charged with violating such a policy, but, after he demonstrated that his conduct was in line with the policy communicated to him in Yugoslavia, that allegation was not pursued.

**16.** Although Dowling offered to allow this individual to serve subject to case-by-case approval of assignments by the USIA's Security Office, that offer came only after the FSGB's decision that Krc's termination was irrational.

that might contradict a conclusion that nothing untoward happened here, might necessitate a trial on the troubling issue of whether Krc would have been treated the same way if he were heterosexual, and might even require us squarely to decide the rationality of this type of discrimination against homosexuals. I fear that under the relaxed standard for summary judgment used in this case and other recent gay rights decisions, *see Doe v. Gates*, 981 F.2d 1316 (D.C.Cir.1993), it will be rare for any equal protection claim to survive the government's assertion that individualized conduct-based considerations unrelated to the plaintiff's sexual orientation led to the adverse personnel action. Our changing social and political climate may at last be consigning overt, obvious discrimination against gays and lesbians to the historical dust bin of Jim Crow laws. But, if history is a reliable guide, we can expect to encounter covert, subtle bias of an equally invidious and irrational nature. If we too complacently accept all conduct-related explanations for adverse actions against homosexuals without scrutinizing their validity and relevance by the time-honored test of trial, we will effectively read the Equal Protection Clause out of the Constitution for gay and lesbian Americans.

On that basis, I dissent.