**Vincent B. ORANGE, Sr., et al., Appellants,**

**v.**

**DISTRICT OF COLUMBIA, et al., Appellees.**

Nos. 94–7080, 94–7081.

United States Court of Appeals, District of Columbia Circuit.

Argued March 3, 1995.

Decided July 18, 1995.

Johnnie A. Landon, Jr., Washington, DC, argued the cause for appellants. With him

on the briefs was James E. McCollum, Jr., College Park, MD.

Robin C. Alexander, Washington, DC, argued the cause for appellees. With her on the brief were David A. Splitt and Charles L. Reischel, Deputy Corp. Counsel, Washington, DC. Vanessa Ruiz, Washington, DC, entered an appearance.

Before WILLIAMS, HENDERSON, and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

This is a suit by three former high-level administrators of the University of the District of Columbia who were appointed by the Interim President in the last days of his term and dismissed by the University shortly after it appointed his successor. The administrators claim breach of contract and deprivation of property without due process in violation of the Fifth Amendment. Two of the three also assert First Amendment violations, alleging that they were dismissed in retaliation for exposing questionable and even fraudulent billing practices by a University fuel oil contractor. The district court granted summary judgment to the University, ruling that the administrators' employment contracts were invalid and rejecting their First and Fifth Amendment claims. We affirm the district court in all respects.

## I.

In early June, 1991, less than two weeks before his term ended, Interim University President Dr. Miles Mark Fisher, IV negotiated and executed nearly identical employment contracts with Vincent B. Orange, Sr. and Deborah Anderson to serve, respectively, as Acting Internal Auditor and Senior Auditor, and with Claude Willis to serve as Acting Director of the Office of the Budget. Dr. Fisher appointed each on a non-competitive basis for a one-year term with an automatic one-year renewal. *See* Terms and Conditions of Contract Appointment [hereinafter Fisher Contracts], *in* Joint Appendix (J.A.) at 145, 149, & 239.

Later in the same month, the Board of Trustees selected a new president and terminated Dr. Fisher's temporary appointment. At the same time, it established a Transition Management Team to oversee the operation of the University until the new president assumed his post. The Chairman of the Board directed the Transition Team to review Dr. Fisher's last-minute personnel actions. One of the members of the Transition Team, Arthur W. Danner, Vice President for Finance, requested Orange, Anderson, and Willis to provide him with written confirmation of their appointments. They complied. The Team then submitted the Fisher appointees' contracts to the University's General Counsel for legal review.

That same week, in one of his first actions as Acting Internal Auditor, Orange notified the Transition Team that his office was investigating possible overbillings by a fuel oil contractor, Tri–Continental Industries. *See* Memorandum from Vincent B. Orange, Sr. to the Transition Management Team (June 26, 1991), *in* J.A. at 183–84. Tri–Continental's fuel oil sales to the District of Columbia, including the University, were already the subject of an ongoing, city-wide investigation led by the Inspector General of the District of Columbia in collaboration with the D.C. Metropolitan Police Department and the U.S. Attorney's Office. In a second memorandum to the Transition Team, Orange described the investigation of "the District Inspector General and UDC's Office of Internal Audit," including several preliminary findings that fuel oil bills were paid "without appropriate verification" and that unauthorized personnel had signed fuel delivery tickets. Memorandum from Vincent B. Orange, Sr. to the Transition Management Team (June 27, 1991), *in* J.A. at 187. Orange sent copies of this memorandum to members of the Board of Trustees, the District Inspector General, the U.S. Attorney, the Mayor, members of the City Council, the Metropolitan Police Department, and others. *Id.* at 2, *in* J.A. at 188.

In a letter dated July 3, 1991, the Transition Team notified Orange, Anderson, and Willis that it had rescinded their appointments because Dr. Fisher lacked the authori-

ty to confer them. They were paid in *quantum meruit* for the days that they had worked. When the three Fisher appointees refused to vacate their offices, the University locked them out.

Orange and Anderson sued the District of Columbia, the University, the Transition Management Team, each individual member of the Team, the University's General Counsel, his law firm, and an Assistant General Counsel. We refer to these defendants collectively as "the University." Alleging that the University had discharged them in retaliation for their investigation of Tri–Continental, Orange and Anderson claimed violations of the First and Fifth Amendments. They also claimed breach of contract and defamation. They sought damages as well as declaratory and injunctive relief. In a separate action, Willis sued the same defendants, claiming breach of contract and violation of the Fifth Amendment Due Process Clause. Consolidating these cases, the district court ruled, on cross-motions for summary judgment, that the employment contracts were *ultra vires* and void *ab initio*. It held that Dr. Fisher had exceeded his authority by executing contracts that deviated from the University's personnel policies without seeking Board approval as required by the regulations. Finding no First Amendment violation nor any liberty or property interest to sustain a due process claim, the district court granted summary judgment for the University on the constitutional claims and dismissed the defamation claims without prejudice. The Fisher appointees appeal.

## II.

■ We review *de novo* the district court's summary judgment decision, giving the party against whom summary judgment is granted the benefit of all reasonable evidentiary inferences that may be drawn in its favor. *Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994). If there is "no genuine issue as to any material fact," we must determine if "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). We begin with an independent evaluation of the employment contracts at the core of this dispute.

University employment contracts must conform to the District of Columbia Comprehensive Merit Personnel Act, D.C.Code Ann. §§ 1–601.1 to 1–637.2 (1992), and Title 8 of the District of Columbia Municipal Regulations, D.C.Mun.Regs. tit. 8 (1988). While the regulations grant the President broad discretion in employment matters, *see id.* at §§ 206.1, 1101.1, this authority is limited by the requirement that he act "in accordance with appropriate personnel regulations." *Id.* at § 206.1; *see also id.* at § 1101.1. The regulations explicitly require the President to seek "[s]pecific authorization by resolution of the Board" for "[a]ny transaction which establishes an exception to approved University programs [and] policies." *Id.* at § 205.3(a).

■ We find in the three contracts several provisions that the Interim President could not have included without Board approval. For example, Orange, Anderson, and Willis received "contract appointments" that the regulations identify as a type of appointment made on a non-competitive basis, *id.* at § 1103.2(b), "for a specified period that is subject to special terms and conditions specified at the time of appointment," *id.* at § 1199.1. According to University practice, contract appointees may be terminated "with or without cause" and are not considered "permanent" employees. *See* UDC Terms and Conditions of Contract Appointment (Standard Form) ¶¶ 3, 5, *in* J.A. at 330. While Interim President Fisher had the authority to make this type of appointment, he could not infuse it with "all rights and privileges ascribed to regular Educational Service employees," Fisher Contracts, *in* J.A. at 145, 149, & 239, without Board approval. A "regular appointment" is a distinct appointment classification that must be "made on the competitive basis of merit," D.C.Mun.Regs. tit. 8, §§ 1103.1, 1103.2, "to fill a position on a permanent basis," *id.* at § 1199.1, and an employee receiving such an appointment "serves a probationary period of one (1) year," *id.* A regular appointee who has completed the probationary period may be disciplined or removed only for "cause," D.C.Code Ann. § 1–617.1(b), including fraud, dishonesty, incompetency, and inefficiency, *see* D.C.Code Ann. § 1–617.1(d). The Interim

President thus plainly exceeded his authority when, without Board approval, he gave the rights and privileges of regular appointees, including "for cause" dismissal, to these three contract appointees.

The three Fisher contracts included provisions regarding discipline, reassignment, and removal that also varied significantly from the University's personnel policies. For example, the contracts prohibited the University from taking adverse action, such as dismissal or suspension, unless the questionable behavior constituted "cause" under D.C.Code Ann. § 1–617.3. Each contract also prohibited reassignment of the appointee "except with his [or her] consent or for unacceptable performance or cause as provided by D.C.Code Ann. § 1–617.3." Fisher Contracts, *in* J.A. at 146, 150, & 240. Because D.C.Code Ann. § 1–617.3 applies only to "permanent" employees, referred to as "regular appointments" under the regulations, D.C.Mun.Regs. tit. 8, § 1199.1, extending these protections to contract appointees like Orange, Anderson, and Willis was an exception to the statute and regulations that required Board approval.

Equally invalid is the "automatic renewal clause" entitling the appointees to a second one-year term. This clause sets forth an elaborate procedure for cancelling the one-year renewal, including a requirement that the president prove by "clear and convincing" evidence "that the appointee has consistently performed a majority of the major duties of the position in an incompetent manner." Fisher Contracts, *in* J.A. at 145, 149, & 239. We have discovered no statutory or regulatory basis for this clause or for the procedures that accompany it. Indeed, the automatic renewal clause amounts to an impermissible extension of the one-year term limit for "acting" appointees, such as Orange and Willis. *See* D.C.Mun.Regs. tit. 8, § 1199.1.

In sum, the Fisher contracts cloaked the non-competitive appointments of Orange, Anderson, and Willis with all the protection granted to competitive appointments. Certain other provisions gave them even greater job security than regular appointees enjoyed. Because the Board of Trustees did not ap-prove these contracts, we conclude, as did the district court, that they were invalid as written. We also agree with the district court that the contracts are not enforceable under a theory of apparent authority. It is well-established that those who contract with a municipal corporation are imputed with knowledge of the limits of the agent's actual authority. *See, e.g., Chamberlain v. Barry,* 606 A.2d 156, 159 (D.C.App.1992).

■ Seeking to salvage at least part of their contracts, the Fisher appointees argue that even if some of the contractual provisions exceeded the Interim President's authority, the remaining parts of the contracts are valid and enforceable to the extent of the Interim President's actual authority. They rely on *Coffin v. District of Columbia,* 320 A.2d 301 (D.C.App.1974), where the D.C. Court of Appeals required the District to pay $2,500 of a landscape consultant's $3,270 bill. The court reasoned that although the contracting agent failed to obtain approval for the expenditure, in violation of the statutory requirement that the Procurement Office approve contracts in excess of $2,500, the agent had authority to bind the District up to that amount. *Id.* at 304. The Fisher appointees have not pointed to, nor have we discovered, any cases where the D.C. Court of Appeals has extended *Coffin,* a procurement case, to the employment context. Even if warranted, such an extension would not help the Fisher appointees because a "contract appointment" that the Interim President could have conferred without Board approval, according to regulations and University personnel policies, would be terminable "at will," i.e., "with or without cause." Thus, even if the *Coffin* principle applied to this case, the University's termination of the Fisher contracts would not constitute a breach of contract.

### III.

Our conclusion that the Fisher contracts were invalid as written does not resolve Orange's and Anderson's First Amendment claims because such claims do not depend upon the existence of a property interest in employment. As the Supreme Court has held, "even though a person has no 'right' to a valuable governmental benefit and even

though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *see also Rankin v. McPherson,* 483 U.S. 378, 383–84, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987) ("[E]ven if [a probationary employee] could have been discharged for any reason or for no reason at all, she may nonetheless be entitled to reinstatement if she was discharged for exercising her constitutional right to freedom of expression."). Applying this principle, we have held that an "at-will" employee is entitled to protection from dismissal for exercising First Amendment rights, *see Hall v. Ford,* 856 F.2d 255, 259 (D.C.Cir.1988), as is a mere applicant for a government position, *Hubbard v. EPA,* 949 F.2d 453, 460 (D.C.Cir.1991), *rev'd in part on other grounds,* 982 F.2d 531 (D.C.Cir.1992) (en banc). Orange and Anderson can therefore prevail on this claim if they can show that the University dismissed them for exercising their First Amendment rights, whether or not they had an enforceable employment contract.

■ Orange and Anderson claim that the University terminated their contracts in retaliation for their disclosure of potential fraud surrounding the University's fuel oil payments to Tri–Continental. Orange claims that his dismissal violated his First Amendment right to freedom of expression. Anderson asserts her First Amendment right to freedom of association, claiming that her dismissal resulted from her association with Orange and his protected expression. Because we conclude that Orange's speech was not constitutionally protected, we do not reach Anderson's freedom of association claim.

■ While public employees do "not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment," *Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983), their right to speak free-

ly may be limited by the government's interest "as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1735, 20 L.Ed.2d 811 (1968); *see also American Postal Workers Union v. United States Postal Service,* 830 F.2d 294, 300 (D.C.Cir. 1987). In reviewing a public employee's First Amendment claim, this Circuit engages in a four-part inquiry that derives from *Pickering* and its successors, *e.g., Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). *See Hall,* 856 F.2d at 258. We first ask whether the speech at issue involves a matter of public concern. If it does, we "balance ... the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734–1735. From these two inquiries, which are questions of law, we determine whether the speech constitutes protected activity. *See Hall,* 856 F.2d at 258. If the speech is constitutionally protected, the employee must prove that the speech was a "substantial or motivating factor" in the discharge. *Id.* Finally, "the government employer must be given an opportunity to prove that it would have reached the same decision even absent the protected conduct." *Id.* The last two inquiries are questions of fact usually left to the jury. *Id.*

Beginning with the first *Pickering* factor, we have no doubt that Orange's disclosure of the questionable billing practices of the University's fuel oil contractor involved "a matter of public concern." *Connick,* 461 U.S. at 146, 103 S.Ct. at 1689. Certainly, examining potential fraud at a public university involves matters of interest to the community, seeking as it does to "bring to light actual or potential wrongdoing or breach of public trust." *Connick, id.* at 148, 103 S.Ct. at 1691; *cf. Sanjour v. EPA,* 56 F.3d 85, 91 (D.C.Cir.1995) (en banc) (speech addressing current government policies is "paradigmatic" matter of public concern). As several of

our sister circuits have recognized, employees who expose government fraud or corruption engage in First Amendment-protected activities. *See, e.g., Feldman v. Philadelphia Hous. Auth.*, 43 F.3d 823, 829 (3rd Cir.1994); *Swineford v. Snyder County Pa.*, 15 F.3d 1258, 1272 (3rd Cir.1994); *Powell v. Gallentine*, 992 F.2d 1088, 1091 (10th Cir.1993).

Balancing Orange's interests against the University's—the second *Pickering* step—we note that the District of Columbia was aware of the potential wrongdoing before Fisher even appointed Orange and that it had gathered its forces to investigate fuel oil deliveries to many city agencies. Instead of revealing undiscovered corruption, Orange had interjected himself into an ongoing city-wide investigation. Not surprisingly, the investigators were concerned. The day after Orange issued his second memorandum, the Inspector General wrote to Vice President for Finance Danner, stating his concern that Orange's memo had resulted in the "unauthorized disclosure" of confidential information that "jeopardizes the integrity" of the "government-wide investigation" that was "now subject to formal criminal process." Letter from Samuel McClendon, Esq., Acting Inspector General, Office of the Inspector General, to Arthur W. Danner, Vice President for Finance (June 28, 1991), *in* J.A. at 304. The Inspector General warned that the wide circulation of Orange's memorandum "conceivably could alert the target(s) to the specific areas of inquiry." *Id.* He emphasized that his "office has not sought or requested assistance from the UDC's Office of Internal Audit, other than a general request for UDC to make records available for our review"; that "due to the sensitive nature of the investigation, no government entity, excepting OIG, MPD, and the U.S. Attorney's Office, should be involved in the actual investigation"; and that the "matter has been placed under seal by the Court." *Id.* The U.S. Attorney was equally concerned. He wrote directly to Orange, reiterating that "[w]e have requested that you not conduct an independent audit," emphasizing that "the confidentiality of this ongoing investigation [should] not be compromised." Letter from Jay B. Stephens, U.S. Attorney, District of Columbia, to Vincent B. Orange, Sr. 1–2 (July 1, 1991), *in* J.A. at 302–03.

Applying the *Pickering* factors, we conclude that the government's interest in protecting the integrity of its investigation into fraud clearly outweighed whatever interest Orange had in disclosing confidential information obtained as a result of his own investigation. *See, e.g., Barnard v. Jackson County, Mo.*, 43 F.3d 1218, 1224–25 (8th Cir.1995) (legislative auditor's interest in disseminating audits and investigation results to press before providing that information to legislators was outweighed by legislators' interest in efficient functioning of legislature), *petition for cert. filed*, 63 U.S.L.W. 3834 (May 10, 1995). We thus have no need to consider the final factors identified in *Hall*, although we note that the record in this case indicates that the Board's concern with the validity of Fisher's appointments predated Orange's disclosures about Tri–Continental and independently led to a legal determination that the contracts were invalid. *See, e.g., Mount Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 286, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977) (formulating "a test of causation which distinguishes between a result caused by a constitutional violation and one not so caused.").

## IV.

▮ Orange and Anderson, together with Willis, next claim that the University's termination of their employment without a hearing deprived them of a property interest without due process in violation of the Fifth Amendment. Orange and Anderson also allege that certain statements made by the University damaged their professional reputations, depriving them of a liberty interest in violation of the Fifth Amendment. *See Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954) (applying Fifth, rather than Fourteenth, Amendment to District of Columbia). These allegations require that we engage in a "familiar two-part inquiry": we must determine whether the plaintiffs were deprived of protected property or liberty interests, and, if so, whether they received the process they were due. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102

S.Ct. 1148, 1153, 71 L.Ed.2d 265 (1982). Because we conclude that the alleged conduct implicated neither property nor liberty interests, we do not reach the procedural element of the test.

■ To prevail on the first of their due process claims, the Fisher appointees must demonstrate a property interest in continued employment. *See Cleveland Board of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). "Property interests," the Supreme Court has held, "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). To establish a property interest, Orange, Anderson, and Willis rely exclusively on their allegedly valid contracts with the Interim President. Because we have concluded that those contracts were beyond the Interim President's authority, they do not constitute a property right that triggers the procedural protections of the Due Process Clause. *See, e.g., Hall,* 856 F.2d at 265–66. The result is no different even if the contracts are enforceable to the extent of the Interim President's actual authority. *See supra* at 1271–72. As we have said before, "[t]hose who are terminable at will have no property interest because there is no objective basis for believing that they will continue to be employed indefinitely." *Hall,* 856 F.2d at 265; *see also Roth,* 408 U.S. at 577–78, 92 S.Ct. at 2709 (no property interest arises when contract for limited term expires and is not renewed).

■ In support of their liberty interest claim, Orange and Anderson allege that the University disseminated false statements that "stigmatized" their professional reputations and foreclosed their opportunities for future government employment. The allegedly damaging statements, appearing in a Transition Team document dated August 1, 1991, assert that Orange and Anderson "publicly exposed an official, confidential, and ongoing investigation of the District Government fuel oil deliveries" by the Inspector General, the Metropolitan Police Department, and the U.S. Attorney. President's Report to the Board (August 1, 1991), *in* J.A. at 216. Although we are uncertain which portions of the report Orange and Anderson claim as false, we understand they object to statements accusing them of exceeding their authority by engaging in the Tri–Continental investigation, by continuing their investigation despite instructions to cease, and by removing confidential files from the Office of Internal Audit. *See id.* at 3–4, *in* J.A. at 216–17.

■ By themselves, charges of government defamation are insufficient to create a liberty interest. *See Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976). But liberty interests arise if employees are terminated in a manner that "stigmatizes" them by impugning their reputations or foreclosing their future employment opportunities. *Board of Regents v. Roth,* 408 U.S. at 572–73, 92 S.Ct. at 2706–07; *see also United States Info. Agency v. Krc,* 905 F.2d 389, 397 (D.C.Cir.1990); *Doe v. DOJ,* 753 F.2d 1092, 1105 (D.C.Cir.1985). We have described this as a "reputation plus" standard, *Doe v. DOJ,* 753 F.2d at 1106 (internal quotation marks and citation omitted), and we require that the plaintiffs show that the government "altered [their] status in a tangible way, and that an imposition of stigma or injury to reputation accompanied this change in status." *Krc,* 905 F.2d at 397; *see also Taylor v. RTC,* 56 F.3d 1497, 1506–07 (D.C.Cir.1995); *Kartseva v. Department of State,* 37 F.3d 1524, 1527–30 (D.C.Cir. 1994); *Doe v. Casey,* 796 F.2d 1508, 1523 (D.C.Cir.1986), *aff'd in part and rev'd in part sub nom. Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988).

We need not decide whether the dismissal in this case would satisfy the "change in status" requirement because Orange and Anderson failed to demonstrate that the University actually stigmatized their reputations. As we have held, injury to reputation cannot occur in the absence of public disclosure of the allegedly damaging statements. *See, e.g., Doe v. Cheney,* 885 F.2d 898, 910 (D.C.Cir. 1989) (agency's action not stigmatizing because agency made no "public accusations that will damage [plaintiff's] standing and associations in the community."); *Mosrie v.*

*Barry,* 718 F.2d 1151, 1157 (D.C.Cir.1983) (must show "public stigma"); *cf. Doe v. DOJ,* 753 F.2d at 1111–12 (stigma results when charges of unprofessional conduct and dishonesty are disseminated to prospective employers, public and private). Orange and Anderson "assumed" that the August 1 report was distributed to the Board of Trustees and that it subsequently became part of the public record. Deposition of Deborah A. Anderson 72–73 (May 22, 1992), *in* J.A. at 356–57; Deposition of Vincent B. Orange, Sr. 64–65 (May 22, 1992), *in* Addendum to Appellees' Brief at 44–45. But Vice President Danner stated that notwithstanding the report's title, "President's Report to the Board," it was prepared solely for the incoming president and was neither circulated to the Board of Trustees nor made available to the public. Affidavit of Arthur W. Danner ¶ 28, *in* J.A. at 312. Orange and Anderson offer no evidence to the contrary; nor have we found any in the record.

Orange and Anderson also failed to demonstrate that the allegedly false statements in the August 1 report foreclosed their opportunities for future government employment. (They make no allegation regarding non-government positions.) *See Krc,* 905 F.2d at 397 (plaintiff must show that "the stigma has hampered future employment prospects"). Indeed, since their dismissals, neither has sought a position in the government. When asked if she had applied for any government positions, Anderson responded:

A: No, I have not.

Q: For any particular reason?

A: Well, part of the reason was that you read in the papers there's been a hiring freeze, mainly. That would be the main thing....

Deposition of Deborah A. Anderson 72 (May 22, 1992), *in* J.A. at 356. When asked about his employment situation, Orange said:

A: I have employment. I have my own practice.

Q: Is that how you intend to develop your career?

A: Yes, that's my intention right now.

. . . . .

Q: Have you applied for any government position since you left the job at UDC?

A: I have made no formal applications for employment.

. . . . .

Q: Have you applied for any Federal Government positions?

A: As I told you I'm employed....

Q: Does that mean that you are not seeking employment at this time?

A: I'm employed. ... I'm not out looking for employment because I'm employed by Vincent Orange.

Deposition of Vincent B. Orange, Sr. 66, 70–71 (May 22, 1992), *in* Addendum to Appellees' Brief at 46, 49–50. In the absence of a showing that the statements in the Transition Team's August 1 report caused public stigma or foreclosed government employment opportunities, no liberty interests arose.

### V.

 We affirm the district court's grant of summary judgment to the University on plaintiffs' breach of contract and First and Fifth Amendment claims. We also affirm the district court's dismissal without prejudice of Orange's and Anderson's state law defamation claims. While pendent jurisdiction is discretionary, "[c]ertainly, if the federal claims are dismissed before trial, ... the state claims should be dismissed as well." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *see also Danielsen v. Burnside–Ott Aviation Training Ctr.,* 941 F.2d 1220, 1232 (D.C.Cir.1991).

*So ordered.*