**Jacqueline P. TAYLOR, et al., Plaintiffs,**

v.

**RESOLUTION TRUST CORPORATION, Defendant.**

**No. Civ. A. 94–1916(JR).**

United States District Court,
District of Columbia.

June 13, 1997.

Thomas M. Devine, Gov't. Accountability Project, Washington, DC, Thad M. Guyer, Medford, OR, for Plaintiffs.

Marina Utgoff Braswell, Asst. U.S. Atty., Washington, DC, for Defendant.

### MEMORANDUM

ROBERTSON, District Judge.

Plaintiff, a former employee of the Resolution Trust Corporation, challenges personnel actions taken against him by RTC, claiming that they were taken in retaliation for his whistle blowing activities. Plaintiff's complaint alleges violations of the RTC Whistle-

blower Act, 12 U.S.C. § 1441a(q), and the First and Fifth Amendments. Only the First Amendment claim of retaliatory discharge and subsequent blacklisting went to trial, the rest having been dismissed by order dated June 11, 1996. The case was tried by the Court sitting without a jury on April 28, 29, and 30, 1997.

### Facts

After reviewing the trial record, and taking into account the Court's assessment of the credibility of the witnesses, the Court makes the following findings of fact:

1. Richard Dunn began work at the Resolution Trust Corporation as a Total Assets Performance Analysis (TAPA) Review Specialist on August 12, 1991. He was actually a contract employee of the Federal Deposit Insurance Corporation, known as an LG employee, the letters "LG" standing, ominously, for "liquidation grade." His contract was for one year and was renewable. Most LG employees working at RTC were given routine renewals of their appointments, although it was understood that the RTC would "sunset" on December 31, 1995.

2. Dunn was hired by Leonard Boyer and served under Boyer's supervision until May 1992. The task of the RTC at that time was to intervene in failing thrift organizations, close them, and dispose of their property by sale or otherwise.

3. On April 23, 1992, Dunn created and sent an e-mail to several people within the RTC (PX26, DX10) noting that an RTC contractor, Control Associates, had billed and had been paid far more money than its contract or RTC's budget allowed. In his e-mail, Dunn asked the addressees whether anyone had approved these overpayments. Boyer, who was then his supervisor, responded by e-mail the same day, noting that Dunn had raised interesting questions but exhorting him to work with and insure the cooperation of the Contracts Administration department.

4. On April 24, 1992, Dunn made an anonymous telephone call to the FDIC/RTC telephone "hotline," an organ of the Office of Inspector General established to receive ethical inquiries or complaints. In that first call, and in a number of later anonymous telephone calls, Dunn expressed concerns about the planned and imminent downsizing of RTC's office in Valley Forge, Pennsylvania, where Dunn was then assigned, and about personnel issues at that office.

5. Dunn did not mention his Control Associates over-billing allegation in his hotline calls, nor did he raise the subject of Control Associates with anyone in the Office of Inspector General until November 5, 1992. (Dunn did raise his concerns about Control Associates with an ethics officer during the summer of 1992, and he followed up at a meeting with a Mr. Mooney at the end of August 1992. Dunn's testimony (the only evidence on these contacts) was that he found the ethics officer "somewhat supportive," but that he was not successful in achieving what he wanted, which was a general audit of Control Associates' performance.)

6. In July, 1992, Dunn sent an e-mail (DX45) to an RTC manager, Allan Morehead, complaining about a reorganization that would change his responsibilities. This e-mail evidently offended Dunn's immediate supervisor John Walsh (PX42).

7. At the end of August 1992, Leonard Boyer prepared an annual performance appraisal for Dunn. Boyer had not been Dunn's supervisor for several months, but Walsh asked him to do the appraisal. The appraisal was distinctly unfavorable and contained, among other things, the observation that Dunn involved himself in matters "best left to others." This appraisal was delivered to Dunn sometime in September 1992. Dunn complained to Boyer about the appraisal and asked that it be changed or improved. On October 5, 1992, Boyer refused (DX17). On the same day, Dunn was given notice that his temporary appointment would expire in 90 days (DX36).

8. In late October 1992, Dunn approached Joseph Wisnewski, a high level RTC manager, about his appraisal. Wisnewski told him to follow the chain of command if he was raising a performance issue, but he encouraged Dunn to bring the matter to his attention if his concerns involved something else. On October 28, 1992, Dunn made a formal

written response to his performance appraisal, demanding that his ratings be made more favorable, or at least that he be given specific examples of his shortcomings (PX8, DX12).

9. On November 5, 1992, Dunn made another complaint to the OIG hotline. This time, he asked for and was given a meeting, and he abandoned his anonymity. At this meeting Dunn raised and complained about the contracting irregularities he had previously brought to the attention of his superiors, and he asserted that his unfavorable performance appraisal had been given in retaliation for his earlier hotline calls about downsizing and personnel issues. According to Dunn, the OIG's reaction was that it would deal with his allegations against Control Associates but that, "if you want to argue out with management what is happening to you, go a different route," namely, the route of the grievance process.

10. On November 12, 1992, Dunn filed a formal grievance (PX11, DX7), complaining that his performance appraisal was nonspecific and retaliatory. The grievance was brought to the attention of Stephen Haley, a high level manager at RTC. Haley's first response was to direct Dunn's supervisors to provide specifics, which they immediately did. Haley then convened a meeting in the Newark Airport with Dunn's supervisor, John Walsh, and with Robert Smedley. At that meeting, according to Haley, the decision was made to move Dunn from working on closings to working on conservatorships in order to give him a "chance to succeed." Smedley claimed not to have been paying attention at this meeting and could not remember any details of it. Walsh is deceased.

11. After the Newark airport meeting, Dunn was given a special, "interim" performance appraisal. This one was prepared, not by Boyer, but by Walsh. It covered the period July 12 through October 31, 1992, and it was generally favorable. On the same day that Dunn acknowledged his receipt of this interim and more favorable appraisal, Stephen Haley responded to Dunn's grievance. He rejected several claims but referred the most important ones, claims of reprisal for disclosing information to the OIG, to an official of the Office of Investigations for investigation and review. On October 17, 1992, that official, Gideon Weingarten, reported to Haley his conclusion that there had been no retaliation or retribution against Dunn for his OIG referral.

12. The next document in the case, chronologically, is the most revealing one. It is an e-mail, dated January 27, 1993, that was forwarded to or commented upon by (the exact sequence is not clear from the document) both Robert Smedley and Steven Haley. (PX17). This e-mail reveals several points. First, as early as December 11, 1992, notwithstanding their professed interest at the Newark airport meeting in permitting Mr. Dunn to succeed, Smedley and Haley had already decided that Dunn would be given an "NTE" ("not to exceed") date of April 3, 1993. Second, the originator of the e-mail suggests that Dunn be given a warning letter, so that, if his "performance doesn't improve, he can be dismissed immediately." The third and most telling aspect of the e-mail is the last section, which is quoted in full:

> "DeLinda tells me that we have two new problems with Mr. Dunn that she is investigating—either of which could lead to immediate dismissal:
>
> 1. Carol thinks he has been claiming two different residences on his travel vouchers—depending upon which location he wants to go to that weekend.
>
> DeLinda has asked Pat Cowser to investigate.
>
> 2. Linda Schaeffer got an application from Mr. Dunn for employment with the FDIC. When they did a background check, they found that he had fudged some of his education. DeLinda is trying to get his original application to the RTC to see if he embellished anything on that. If he did, then we've got him."

13. Sometime around April 1, 1993, Smedley's office prepared a performance memorandum on Dunn (DX42), using input provided by Michael Allison, who was the managing agent of an account on which Dunn was then working. This performance memorandum was unfavorable, and its timing was apparently not accidental: four days earlier,

Dunn had entered a building at the Valley Forge Consolidated Office and attempted to use a computer in that building, although he was no longer assigned to work there. This alleged "serious breach of building security and . . . attempted breach of computer security" was discussed with Dunn in a formal meeting on April 1, 1993, the same date on which the performance memorandum was prepared. And, on April 12, 1993, apparently following the advice he had received in the January 27 e-mail, Smedley issued a formal letter of warning to Dunn (DX43) ("neither grievable or [sic] appealable") indicating that any reoccurrence might subject him to "disciplinary action up to and including dismissal." Ten days after that letter, on April 22, 1993, Dunn was given final notice that his NTE date would not be extended and that his last day at RTC would be May 7, 1993 (DX38).

14. The denouement of Dunn's employment at RTC was not pleasant. Dunn made haste to contact members of Congress after being told that this appointment would not be renewed. (PX14, PX12). Those contacts led to Congressional inquiries, which led to nervous e-mails within RTC, which led to an hysterical over-reaction on the part of RTC and to the suggestion on somebody's part that Dunn might attempt to disrupt an RTC meeting in Parsippinay, New Jersey, in early May. An organization with the eponymous or perhaps Swiftian name of "Aggressive Detective Agency" had Dunn followed to his house and so alarmed him that he made a u-turn, proceeded to the nearest police station, and reported the incident. The ensuing investigation of that incident led to a number of high-level denials.

15. As if that were not enough, almost a year later, three RTC employees, Gary Prevatt, Dennis Lauria and James Hambric, learned that Dunn had finally managed to get a job with an RTC contractor, Coopers & Lybrand, and took it upon themselves to provide derogatory information to Dunn's new employer that frightened Coopers & Lybrand into terminating Dunn's employment when it had scarcely begun.

## Analysis

■ To prevail on a claim for violation of the First Amendment, a government employee must prove that his conduct was constitutionally protected and that the protected conduct was a substantial or motivating factor in the adverse personnel action complained of. *Board of County Commissioners v. Umbehr,* —— U.S. ——, ———— ——, 116 S.Ct. 2342, 2347–48, 135 L.Ed.2d 843 (1996). If the employee discharges that burden, the government can escape liability by showing that it would have taken the same personnel action in the absence of the protected conduct. *Id.; Orange v. District of Columbia,* 59 F.3d 1267, 1272 (D.C.Cir.1995). Adverse personnel actions taken because of protected speech may also be justified when legitimate countervailing government interests are sufficiently strong. See *Board of County Comm'rs,* —— U.S. at ——, 116 S.Ct. at 2347; *Pickering v. Board of Ed. of Township High School Dist. 205,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968).

■ Speech is protected activity if it involves a matter of public concern, defined as "a matter of political, social or other concern to the community." *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). In order to have constitutional protection, a public employee must be speaking "as a citizen upon matters of public concern," as opposed to "as an employee upon matters of only personal interest." *Id.* at 147, 103 S.Ct. at 1690.

■ Dunn's complaints about downsizing, internal reorganizations that would affect his responsibilities, negative performance evaluations, and other personnel issues did not touch upon matters of public concern. See id. at 147–49, 103 S.Ct. at 1690–91; *Murray v. Gardner,* 741 F.2d 434, 438 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1050, 105 S.Ct. 1748, 84 L.Ed.2d 813 (1985) (complaints regarding furlough plan merely employee/management issue and not matter of public concern). Rather, Dunn's complaints addressed his own personal dissatisfaction with personnel actions and were not designed to "inform the public" about the operation of a government agency. *Connick,* 461 U.S. at 148, 103 S.Ct. at 1690–91.

■ Dunn's disclosures of Control Associates' overbilling practices, on the other hand, touched upon matters of public concern. The questions he raised about Control Associates' excessive bills and RTC's payment of those bills had to do with evaluating the performance and operation of RTC as a government agency and were questions of public import. *See Orange, supra,* 59 F.3d at 1272–73 (questionable billing practices of University contractor matter of public concern).[1] The fact that Dunn had disagreements with his superiors on internal matters does not diminish the public importance of the Control Associates issue. *See Hall v. Ford,* 856 F.2d 255, 260 (D.C.Cir.1988).

The court must accordingly determine whether Dunn's protected activities relating to Control Associates played a substantial part, or were a motivating factor, in the adverse actions of which Dunn complains—that is, the negative performance appraisal and the decision not to renew his employment. *See Mt. Healthy City School District Board of Educ. v. Doyle,* 429 U.S. 274, 285–86, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977). As for the performance appraisal, the only protected activity Dunn had engaged in when it was prepared in August 1992 that was known to those who prepared the appraisal was the April 24 e-mail about Control Associates. Dunn failed to sustain his burden of proving that the e-mail played a substantial part, or was a motivating factor, in that unfavorable appraisal.[2]

■ The question of whether Dunn's protected activities were a substantial or motivating factor in RTC's decision not to renew his contract is more difficult. Dunn's employment was not simply "not extended." Continuing appointments and even grade increases for almost all other LG employees

were perfunctory. Rather, Dunn's termination was the result of a concerted effort, on the part of at least Stephen Haley and Robert Smedley, to get rid of him. Neither Haley's testimony nor, especially, Smedley's was credible on the benign nature of the hastily convened meeting in the Newark airport, and the chronology makes it quite clear that, from Newark on, the RTC bureaucracy organized itself to build whatever record was necessary to ensure Dunn's dismissal as soon as possible.[3]

The sustained effort to "get" Dunn was at least in part retaliatory, *but not for Dunn's (faint) whistleblowing regarding Control Associates or for his contacts with members of Congress.* Instead, the sins for which Dunn was dismissed from RTC were internal and bureaucratic: he affronted superiors with his e-mails on personnel issues, he complained (accurately) about non-specific performance appraisals, and he had the effrontery actually to utilize formal RTC grievance procedures.

The behavior of RTC officials after Dunn was given his final notice that his employment would not be extended past May 7, 1993, was clumsy, unprofessional and, in the vernacular sense of the word, paranoid. Smedley's testimony distancing himself from the Aggressive Detective Agency's overheated "security activities" was not credible. Nor was the testimony of any of the participants in the shabby termination-by-rumor of Dunn's employment at Coopers & Lybrand. None of that activity, however—the "security" activity or the volunteering of rumors to Coopers & Lybrand—was in retaliation for whistleblowing activity or for statements made to Congress.

Plaintiff failed to establish a prima facie case of a First Amendment violation. The government, accordingly, was not required to

---

1. In *Orange,* the Court of Appeals identified an additional step in the required analysis for determining whether speech constitutes protected activity: applying the *Pickering* factors to "balance ... the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of public services it performs through its employees." *Orange, supra,* 59 F.3d at 1272. In this case, however, that step is inapplicable. The government has neither asserted any interest in prohibiting Dunn's speech

nor identified any harm resulting from it. On the contrary, the government adduced evidence that Dunn's scrutiny of Control Associates was welcome.

2. See footnote 3.

3. The April 1, 1993, performance memorandum (DX42) was part of this effort and is not considered a separate performance appraisal.

prove that it would have taken the same personnel actions in the absence of Dunn's protected conduct.

Judgment will be entered in favor of the defendant on plaintiff's First Amendment claim.

## ORDER

After trial by the Court sitting without a jury, for the reasons stated in the accompanying memorandum, it is this 13th day of June, 1997,

**ORDERED** that judgment be entered for defendant RTC and against plaintiff.